```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION

 3            Case no.:  6:13-cr-94-Orl-37GJK

 4   UNITED STATES OF AMERICA,        )     Orlando, Florida
                                      )     September 11, 2013
 5                 Plaintiff,         )
                                      )
 6                 v.                 )
                                      )
 7   JONATHAN DANIEL ADLETA,          )
                                      )
 8                 Defendant.         )
     _____)

 9

10

11          Transcript of an excerpt (opening statements

12             and the testimony of Sarah Adleta)

13                 of the jury trial (day two)

14            before the Honorable Roy B. Dalton, Jr.

15               United States District Court Judge

16

17   Appearances:

18   Counsel for Plaintiff:  Karen Gable
                             Ilyanis Rivera Miranda
19

20   Counsel for Defendant:  Matthews Bark

21

     Court Reporter:         Diane C. Peede, RMR, CRR
22                           United States Courthouse
                             401 West Central Blvd., #4600
23                           Orlando, Florida  32801
                             (407) 615-0305
24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

2

1                         Index of Transcript

2                                                    Page

3    Opening statements

4    By Ms. Gable                                       3
     By Mr. Bark                                       12

5

6                        Sarah Adleta

     Direct by Mr. Rivera Miranda                      15

7    Cross by Mr. Bark                                 110
     Redirect by Ms. Rivera Miranda                    116

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      P R O C E E D I N G S

2      *****

3              MS. GABLE:  Good afternoon, ladies and gentlemen.

4      Actually, it's morning.  Good morning, ladies and gentlemen.

5      This case is about a father, the defendant, Jonathan Adleta,

6      who had a sexual appetite for his three-year-old daughter,

7      and it's about a mother who fed that appetite by agreeing to

8      transport their little girl across state lines, from Florida

9      to Oklahoma, so that that man could sexually molest his

10     little girl.

11              The evidence in this case will show that the

12     defendant, Jonathan Adleta, began and planned to molest his

13     little girl before she was even born; that after she was

14     born, for the short time that he lived with her, he did

15     molest her and that the abuse continued even after he and the

16     child's mother had divorced and had moved from California,

17     where they were living, to Florida.  Even thousands of miles

18     apart, the abuse continued.

19              In this case you will hear and you will see the

20     words of Jon Adleta, the words that he wrote, the words that

21     he wrote in a diary, in his text communications with the

22     mother of the child, Sarah Adleta, and in his Skype

23     communications with her, his words of his plans to sexually

24     abuse this child, of his intent to sexually abuse this child.

25              You will hear from two mothers, the mother of the

1    little girl, K., the victim in this case, and of the mother

2    of another child, both women who were involved with him,

3    mothers who both had small children, mothers who both had

4    daughters who were under the age of five, and both of those

5    women will recount for you and testify about the defendant's

6    deviant desire for daddy-daughter sex and they will recount

7    for you their eyewitness accounts of his sexual abuse of both

8    of their daughters.

9            The evidence of Jon Adleta's words and his conduct

10   will show that his intent was to molest K. when he caused her

11   mother, Sarah, to transport her from Florida to Oklahoma in

12   December of 2012 during the winter holidays.

13           In March of 2009, K. was born to Jon and Sarah

14   Adleta.  From the time that she was born, the defendant began

15   to lay the groundwork for the life that he wanted to live

16   with K.  He began to lay the groundwork for his family

17   values, values that included the sexual abuse of K.

18           He told Sarah that he was into daddy-daughter sex.

19   He involved Sarah in a deviant sexual lifestyle.  He told

20   Sarah that he was into young.  He showed her stories on his

21   computer, stories that he had downloaded from the Internet,

22   stories that were about fathers, fathers having sex with

23   their little girls.

24           In May of 2010 the defendant, who was in the Marine

25   Corps, was deployed to Afghanistan.  At this time Sarah was

pregnant with their second child, J., and they were

contemplating marriage.  While in Afghanistan, the defendant

kept a paper trail of his intent to molest little K. and J.

It was a paper trail that he kept in the form of a diary, a

diary that law enforcement seized three years later during

the execution of a search warrant at his home, and in this

diary the defendant laid out his plans to sexually abuse his

children and his requirement that Sarah live by his family

rules, because, as you will see in this diary, according to

his rules, he wanted the family to live as nudists.  He

wanted to teach the children how to have sex.  He wanted to

have sex in front of the children.  He wanted there to be no

boundaries.

        In his words, in his words, he said that he wanted

to feel up K.  This child was two years old at this time.  He

said that he wanted to teach her how to give him a blow job

and that he wanted to teach her how to give him a hand job

and that he wanted to give her a "facial," a term that he

used for ejaculating on the child.

        According to his rules, he wanted to teach his son,

who was not even born yet, techniques, sexual techniques; and

he wanted Sarah to give him, the little boy that was not even

born, a blow job.

        You will see in this diary that he wrote when he

was in Afghanistan that he negotiated with Sarah, because

they were contemplating marriage, and he was negotiating with her about this and wanting to make sure that she knew what he was all about, and that eventually she relented and she agreed.  She agreed to live by the defendant's rules and to live a lifestyle where child sexual abuse was part of their parenting plan.

In November of 2010 the defendant returned to the United States and lived with Sarah and the kids in California.  During this time he did exactly what he said he was going to do in that diary that he kept in Afghanistan. The family lived as nudists.  He was naked in front of the children.  Sarah was naked in front of the children, and he began to teach K. how to have sex.  While he was naked with her, he had her place her little hand on his penis and he was erect and he masturbate in front of the child as if to get her used to what that looked like.

Later, the defendant and Sarah divorced in 2012 and she moved back to Oviedo, Florida, with her two young children; but despite being thousands of miles apart, the defendant and Sarah continued to parent their children as they had agreed to at the time of their marriage.  They continued to sexually abuse their children.

The defendant, who was in Texas at this time, asked Sarah to Skype with him and they Skyped frequently and during these Skype communications where they could see each other, a

1   video application where they could talk to each other through

2   their computers and over their computer monitors they could

3   see each other, it was realtime, he asked Sarah to display

4   their little girl naked, and while she was naked, he

5   masturbated in front of the child.  This was part of his

6   family values, part of the way he wanted to raise his

7   children.

8           Sarah, who was completely warped by this time, also

9   began to molest her little girl and her little boy; and the

10  defendant asked her to take pictures, and she did and she

11  sent those pictures to him.

12          When law enforcement recovered his computer from

13  his home during the execution of the search warrant in 2013,

14  they found one of those pictures; and I apologize, but you

15  will see that picture and it's a picture of Sarah molesting

16  her little boy, one that he received in November of 2012, a

17  picture that he kept on his computer in his saved folders.

18          During this same month, in November of 2012, the

19  defendant found another woman.  Her name is Samantha and you

20  will hear her testify.  And, like Sarah, she had a little

21  girl, who was four years old, and a little boy, who was

22  three, and the two of them dated and they were contemplating

23  marriage; and, again, the defendant began to set down what

24  his rules were for their family.  He told Samantha that he

25  was into daddy-daughter sex.

1          As he had done with Sarah, he Skyped with Samantha

2    because they did not live in the same area; and while he

3    Skyped with her, he, too, asked her to display her little

4    girl naked, which she did, and he masturbated while he saw

5    her.  He told Samantha again about his daddy-daughter

6    fantasies and he told her that he was sexually interested in

7    young girls.

8          In November of 2012 the defendant visited Samantha

9    just weeks before he was expecting K.'s arrival to visit with

10   him in Oklahoma; and while he was at Samantha's home, he went

11   into M.'s room, who was Samantha's little girl, and with

12   Samantha present, he laid in bed with M. and he placed his

13   penis, which was erect, against M.'s back side, pulled down

14   her underwear and placed it inside of her underwear and had

15   Samantha take pictures of it with his digital camera, which

16   she did, and Samantha sent those pictures to him through her

17   e-mail account on November 19th of 2012.

18         Law enforcement recovered one of those pictures off

19   of the defendant Jonathan Adleta's computer media, a picture

20   of him molesting little M.

21         In December of 2012, just two weeks before K.

22   arrived in Oklahoma, Samantha moved in with Jon and her

23   children came to visit.  During that time the defendant had

24   K. (sic) in the living room.  He masturbated on K. -- I'm

25   sorry -- on M., Samantha's child, and he had Samantha video

1   record it.

2          During their conversations in November of 2012, the

3   conversations between the defendant and Sarah Adleta about

4   the trip to Oklahoma, they talked about what they both

5   expected.  In November of 2012, the early part of November of

6   2012, Jon Adleta told Sarah that he wanted both her and her

7   daughter and her son to visit him during the winter holidays

8   and he told her that he would pay for the ticket because

9   Sarah didn't have any money.  She couldn't pay for it.

10          During their conversation he told her that he

11  wanted to molest their daughter, K., and he specifically told

12  Sarah that he planned to give K. a "facial," Jonathan

13  Adleta's words, and that he planned to have her give him a

14  blow job, and he asked Sarah, "Are you okay with this?  Is

15  this good?"  And she said, "Yes."  He told Sarah that he

16  planned to video record it.

17          So in December of 2012, on December 23rd, Sarah and

18  the children flew out to Oklahoma.  Jon picked them up.  The

19  defendant picked them up from the airport, took them back to

20  the house; and not less than two days after their arrival,

21  Jonathan Adleta called Sarah into his bedroom and he had K.

22  on the bed.  He was standing up.  He was naked and he was

23  erect and he began to masturbate in front of little K., and

24  then he lied on his bed and he put K. on top of him and he

25  continued to masturbate and then he ejaculated on her.  As he

had done with M. just two weeks earlier, he had done the same

thing to K., exactly what he said that he intended to do.

He told Sarah later during that trip that he had

had K. in the shower with him and that he had put his penis

in her mouth.

When on January 2nd Sarah flew back to Florida with

her children and she and the defendant began to talk about

and make arrangements for transporting K. back and forth so

that K. could spend time with the defendant in Oklahoma, they

talked about him having her every two weeks and him having

her every three weeks and they talked about in their

communications the sexual abuse of K.

You'll see five text and Skype communications that

occurred after Jonathan -- after Sarah Adleta returned to

Florida, between Jonathan Adleta and Sarah Adleta, and they

talk about the sexual abuse of K.  In one of the

communications Jonathan Adleta asked Sarah whether she

enjoyed seeing him come on K.

In another communication he told Sarah, after Sarah

remarked that K. freaked out when the defendant ejaculated on

her in Oklahoma, the defendant's solution was to find other

men to ejaculate on her so that she would get used to the

idea of being in that situation.

In their last communication, in March of 2013,

Sarah told the defendant, Jonathan Adleta, that she was in

1   communication with another man, another pedophile, who was

2   molesting his daughter and that she was planning to take K.

3   up to him for that purpose, and Jonathan Adleta's reaction

4   was, "Well, if you do, you've got to record it."

5           As far as conduct, the defendant has been charged

6   with conspiracy, conspiring with Sarah Adleta, to transport a

7   minor in interstate commerce, K., three-year-old K., with the

8   intent of engaging the child in sexual activity; and he's

9   also been charged with joining with Sarah to transport that

10  child in interstate commerce with intent to engage her in

11  sexual activity.

12          At the end of the day this case will be about the

13  defendant's intent.  When he had Sarah bring K. to him, did

14  he intend to sexually molest her?

15          How do we discern somebody's intent?  It's by their

16  words and by their actions, what they say and what they do.

17          In this case we will present to you ample evidence

18  of the defendant's words and his actions, which will prove to

19  you beyond a reasonable doubt that his intent was to molest

20  K. when he caused her travel in 2012, and that he in fact

21  committed these terrible crimes.  Thank you.

22          THE COURT:  Mr. Bark, do you wish to make an

23  opening?

24          MR. BARK:  Please, Your Honor.

25          THE COURT:  All right.  You may proceed.

1          MR. BARK:  Thank you.

2          Good afternoon -- good morning, ladies and

3   gentlemen.  I don't even want to make light of that.  What

4   you're about to see and observe and hear are some of the most

5   disturbing things you'll probably hear and see in your life,

6   and that's part of why we went through great lengths during

7   jury selection to make sure you could overcome that and look

8   at all the evidence to see if the government proved the

9   allegations against Mr. Adleta.

10         Now, you're in one of the most difficult positions

11  I believe anybody could be in, in an effort to come to a

12  decision as to someone's guilt or not.  The reason I say that

13  is you have not been instructed on what the law is that you

14  are to apply to the evidence, that you will hear and that you

15  will see.

16         There are certainly going to be moments where you

17  are full of emotion or you may be assured to yourself of

18  guilt or perhaps even not guilt, but I ask you to please

19  reserve on that to the best of your ability, because it is

20  not until you hear everything, see everything and then you're

21  instructed on the law that you can come to a fair verdict.

22  This is going to be a very challenging exercise and one that

23  you are not often asked to do in life.

24         I don't have a terrible amount to say at this

25  point, but there is something else I'd like to point out to

1    you, which is you're going to hear about a virtual reality,

2    you're going to hear about fantasies, and you will hear about

3    actual acts, and you're going to have to make a determination

4    at some point which is which and at what point which occurs.

5    It's going to be very difficult to do that through the

6    discernment of the evidence, but as you go through it, you're

7    going to be asked to do that and have to do that.  So I'm

8    going to ask you to look closely for what is fantasy and what

9    has actually occurred.

10           Also, you may come to conclusions based on what you

11   believe certain words mean, and the Judge, I believe, will

12   instruct you on what those words mean.  So that those are how

13   you are going to apply it to the case.

14           It's not an easy thing to do.  It's a very

15   difficult case to listen to and to see; but as we stand

16   before you, Mr. Adleta has entered a plea of not guilty to

17   the charges here today, and it is only those charges which he

18   is being tried with today.  So I ask you to keep that in mind

19   as you go through this process.  I believe when you do that,

20   you will actually find him not guilty of these two counts.

21   Thank you.

22           THE COURT:  Thank you, Mr. Bark.

23           Ladies and gentlemen, we're going to take our

24   morning break this morning, give the lawyers a chance to get

25   organized, and so when you come back from your break, then

1    we'll move right into the government's case and the

2    presentation of the witnesses.

3              It's ten minutes till.  So we'll come back at five

4    minutes after the hour and we'll get underway.

5              (Jury not present at 10:49 a.m.)

6              THE COURT:  We'll be in recess until five minutes

7    after the hour.

8              (Recess taken from 10:50 until 11:05 a.m.)

9              (Jury not present.)

10             THE COURT:  Are you ready to proceed, Ms. Gable,

11   Mr. Bark?

12             MS. GABLE:  Yes, Your Honor.

13             MR. BARK:  Yes, sir.

14             THE COURT:  All right.  Bring the jury back,

15   please, Mr. Fiorenza.

16             (Jury present.)

17             THE COURT:  Welcome back, ladies and gentlemen.

18   Were all of you able to abide by my instructions not to

19   discuss the case?

20             (Affirmative responses.)

21             THE COURT:  The government may call its first

22   witness.

23             MS. RIVERA MIRANDA:  Yes, Your Honor.  The United

24   States calls Ms. Sarah Adleta.

25             THE COURT:  Ms. Adleta, if you will, stand there,

1   please, and be sworn.

2                           SARAH ADLETA,

3   having been first duly sworn, was examined and testified as

4   follows:

5              THE COURT:  Have a seat, ma'am.  If you will, pull

6   that microphone up close to you and speak directly into it,

7   please.

8              THE COURTROOM DEPUTY:  Please state your name and

9   spell your last name.

10             THE WITNESS:  It's Sarah Adleta, A-d-l-e-t-a.

11             THE COURT:  You may inquire, Ms. Miranda.

12             MS. RIVERA MIRANDA:  Good morning, ladies and

13   gentlemen, the Honorable Court, and everybody present.

14                      DIRECT EXAMINATION

15   BY MS. RIVERA MIRANDA:

16   Q.   Good morning, Ms. Adleta.

17   A.   Good morning.

18   Q.   I have an accent.  If you don't understand any question,

19   just ask me to repeat it or rephrase it, okay?

20   A.   Okay.

21             THE COURT:  Ms. Miranda, will you pull that

22   microphone towards you a little bit.

23             MS. RIVERA MIRANDA:  There (complies).

24   BY MS. RIVERA MIRANDA:

25   Q.   All right.  How old are you?

1   A.    Twenty-nine.

2   Q.    Okay.  And where are you currently residing?

3   A.    In the Orange County Jail facility.

4   Q.    Okay.  Why are you currently in prison?

5   A.    Because I'm being detained for my charges.

6   Q.    Okay.  Can you please explain to the members of the jury

7   what charges are you detained for?

8   A.    My charges are for distributing and producing child

9   pornography.

10   Q.    Okay.  When were you arrested; do you remember?

11   A.    March 15th.

12   Q.    And that would be of 2013?

13   A.    Yes, ma'am.

14   Q.    Okay.  And you said production of child pornography.

15   Let me ask you, did that involve your children?

16   A.    Yes, it did.

17   Q.    Okay.  Can you please describe to the members of the

18   jury exactly what you did, what were you charged with?

19   A.    I was charged with two counts and both of them are for

20   distributing and producing child pornography.

21   Q.    Okay.

22   A.    My -- I don't know if you want me to go into what

23   happened, but. . .

24   Q.    What did you do with your children?

25   A.    I performed in sexual activities and I posted it on

 1    Skype for people to see, and I performed sexual activities

 2    with both of my children.

 3    Q.    Okay.  Can you please tell the members of the jury how

 4    many children do you have?

 5    A.    I have two children.

 6    Q.    And what are their first names?

 7    A.    K. and J.

 8    Q.    When was K. born?

 9    A.    March 8th of 2009.

10    Q.    What about J.?

11    A.    October 15th of 2010.

12    Q.    Okay.  Let me ask you, in relation to the charges that

13    were filed against you, who were you producing those images

14    for mainly?

15    A.    Aaron Dixon.

16    Q.    And who is this person?

17    A.    He was a friend of mine.

18    Q.    Okay.  When did you meet him?

19    A.    I met him approximately in the 2005 area.  I'm not -- I

20    can't tell you --

21    Q.    Is this a person --

22    A.    -- exactly --

23    Q.    -- that you had a romantic involvement with?

24    A.    Yes, I did.

25    Q.    Okay.  Now, let me ask you, who is the father of your

1   children?

2   A.    Jonathan Adleta.

3   Q.    And if you see Jonathan Adleta here in court today can

4   you please tell the members of the jury where is he sitting

5   at?  What is he wearing?

6   A.    He's wearing a suit, it looks like it's gray in color,

7   and he's on the left-hand side of me.

8              MS. RIVERA MIRANDA:  Your Honor, let the record

9   reflect that the witness has identified the defendant,

10  Jonathan Adleta.

11             THE COURT:  Yes, the record will so reflect.

12  BY MS. RIVERA MIRANDA:

13  Q.    Okay.  Now, what happened with the charges that were

14  filed against you for production of child pornography?

15  A.    I got charged and I've already pleaded guilty to the

16  charges.

17  Q.    Okay.  And you pled guilty pursuant to a Plea Agreement?

18  A.    Yes, ma'am, I did.

19  Q.    And in that Plea Agreement, is there a cooperation

20  provision?

21  A.    Yes, I do have to cooperate.

22  Q.    Okay.  Now, let me ask you, when did you meet the

23  defendant?

24  A.    I met him approximately August of 2008.

25  Q.    And how old were you when you met the defendant, if you

1    recall?

2    A.    Around 22 or 23.

3    Q.    Okay.  How old was he?

4    A.    He would have been 20.

5    Q.    Okay.  Where did you meet him?

6    A.    Where?  I met him at -- I believe at someone's house, a

7    friend of mine.

8    Q.    Okay.  And did you start dating right away or did it

9    take some time?  When did you start actually dating the

10   defendant?

11   A.    It took a little bit of time, but we pretty much had

12   feelings for each other right away, you know, started dating,

13   I guess you could say.

14   Q.    Where did you live at the time when you started dating

15   the defendant?

16   A.    I was residing at my parents' home in Oviedo.

17   Q.    That's Florida?

18   A.    Yes.

19   Q.    Okay.  Where was the defendant residing when you started

20   dating him?

21   A.    He was living in an apartment off of Goldenrod in the

22   Orlando area.

23   Q.    Okay.  Now, let me ask you, did it come a point early in

24   your relation when the defendant expressed a sexual interest

25   in children?

1    A.    Can you repeat the question.

2    Q.    Sure.   If there came a point in your relation with the

3    defendant, early in your relation with the defendant where he

4    expressed an interest, a sexual interest in children?

5    A.    Yes, he did.

6    Q.    In young kids?

7    A.    Uh-huh.

8    Q.    And how did he do that?   How do you know that?

9    A.    Because he would show me these stories online of

10   father-daughter fantasies, sexual fantasies.

11   Q.    This was when you were dating?

12   A.    Uh-huh.

13   Q.    What exactly was he showing you?

14   A.    They were stories that -- you know, you can Google and

15   they are sexual fantasies based on a father and daughter

16   performing in sexual activity.

17   Q.    Do you recall what kind of sexual activities?

18   A.    No, I do not.

19   Q.    Okay.   Now, did he also express an interest in doing

20   things with children?

21   A.    At what point in time are you asking?

22   Q.    Early in your relation.

23   A.    Early?   I wouldn't say right away.

24   Q.    At what point do you remember that he started expressing

25   this interest in children?

1    A.    More towards when my daughter was about two.

2    Q.    Okay.  Now, did you marry the defendant?

3    A.    Yes, I did.

4    Q.    Okay.  And when did that happen?

5    A.    June 24th of 2010.

6    Q.    And where were you residing when you married the

7    defendant?

8    A.    I was residing at my parents' home in Oviedo, Florida.

9    Q.    And where was he at when you married him?

10   A.    He was in Afghanistan.

11   Q.    Okay.  If he was in Afghanistan and you were in Florida,

12   how did that take place?

13   A.    We -- I flew to Texas and you can get married there with

14   a proxy marriage, and his parents stood in his place and we

15   legally got married.

16   Q.    Okay.  You said that he was deployed in Afghanistan at

17   the time that you married him.  Was he in the military?

18   A.    Yes, he was.

19   Q.    Which branch?

20   A.    The Marine Corps.

21   Q.    Do you recall if he was an officer in the Marine Corps?

22   A.    Yes, he was.

23   Q.    Okay.  And do you recall when was it exactly that he was

24   deployed?

25   A.    When?

1  Q.   When?  Uh-huh.

2  A.   May of 2010.

3  Q.   Okay.  So basically before you married, he had already

4  been deployed to Afghanistan, according to your testimony.

5  And let me ask you, when he was deployed, how old was K.?

6  A.   About two and a half.

7  Q.   Okay.  And what about your second son (sic)?  Were you

8  pregnant with your second son when the defendant deployed?

9  A.   Yes, I was.

10  Q.   Okay.  And let me ask you, how did you communicate with

11  the defendant when he was deployed?

12  A.   He would call me from a satellite phone and he also

13  communicated through e-mail service that the Marine Corps

14  had.  You go on a website and you can e-mail each other.

15  It's a form of e-mail.

16  Q.   Okay.  And prior to marrying the defendant, let me ask

17  you, were there any discussions concerning the type of

18  lifestyle that he wanted your family to have?

19  A.   Yes.

20  Q.   Okay.  Can you please tell the members of the jury what

21  exactly were these communications?

22  A.   He had a conversation with me and he basically expressed

23  that he wanted to take pictures of our children as they grew

24  up, especially my daughter, and he wanted to hide them in a

25  safe box.  He also wanted to -- he was curious about doing

1  sexual activity with my daughter, and he also said that he

2  wanted us to be nudists; and he also wanted me to engage in

3  sexual activity with my son, when he was older.

4  Q.    Okay.  Now, can you please tell the members of the jury

5  exactly what terms did he use?  When he said having sexual

6  activity with your daughter and having you perform sexual

7  acts on your son, what were his words?  What did he want to

8  do?

9  A.    He wanted me to have sex with my son when he was, like,

10  high school age and he kind of made the point of maybe, you

11  know, fuck his friends as well.

12  Q.    And what about your daughter?  What interest did he

13  express in your daughter as to the kind of things he wanted

14  you to do with your daughter?

15  A.    He was curious about her giving him a blow job.

16  Q.    Okay.  What do you mean by that?  Oral sex?

17  A.    Yes, ma'am.

18  Q.    Having K. perform oral sex on him?

19  A.    Yes, ma'am.

20  Q.    Okay.  And did he also express an interest in doing

21  anything to her as far as other sexual activities?

22  A.    He was also interested in "facials."

23  Q.    Can you explain to the members of the jury what is that?

24  What did he mean by giving K. a "facial"?

25  A.    Ejaculating either on her face or somewhere on her body.

1    Q.    Did he express exactly when he intended to do this?

2    A.    No.

3    Q.    Okay.  Now, you said these conversations started before

4    your marriage.  Can you estimate when -- when was it that he

5    started talking about these sexual activities, these

6    interests that he had in sexual activities with the children?

7    A.    About a week or -- a week and a half to two weeks before

8    we got legally married.

9    Q.    Okay.  And was this something that you would talk about

10   often?  I mean, was it on one-time occasion?

11   A.    We had several discussions over the satellite phone and

12   he made it very clear that these were -- if I -- I had to be

13   okay with it in order to get married.  So there was

14   conditions placed on it.

15   Q.    So you had to be okay with certain things?

16   A.    And if I wasn't, then he was going to leave me.

17   Q.    Okay.  So basically are you telling us that he made that

18   a condition to your marriage, to have sex with the children,

19   an open sex life and nudism --

20   A.    Yes.

21   Q.    -- as a condition to your marriage?

22   A.    Yes.

23   Q.    Okay.  Were you okay with that initially?

24   A.    Not initially.  I struggled with it and I knew that it

25   was wrong and I -- I -- I really struggled for a while, and

1    then I just kept thinking, well, maybe he'll be

2    disinterested, you know, after a period of time.

3    Q.    Did you agree then at some point to have this kind of

4    lifestyle with your children, open sex life, nudism?

5    A.    Yes, I did.

6    Q.    Okay.  Why did you agree to that?

7    A.    Because I loved him and I had a financial security with

8    him.  I didn't know how I was going to raise two kids by

9    myself, and I basically wanted to do whatever it took to keep

10   him.

11   Q.    Okay.  Even if it included sexually abusing the

12   children?

13   A.    Yes.

14   Q.    And you said financially.  What did you mean by that?

15   Were you working at the time?

16   A.    No.

17   Q.    Did you have other sources --

18   A.    No, I wasn't working.  I was taking care of the kids

19   full time.

20   Q.    Okay.  So who was providing for you, financial support?

21   A.    He was, Jonathan Adleta.

22   Q.    Okay.  Now, let me ask you, at any point while you were

23   involved with the defendant, did you get involved in

24   downloading and saving child pornography?

25   A.    Yes, I did.

1    Q.    Okay.  And how did that happen?  Why did you do that?

2    A.    When?

3    Q.    How and why?

4    A.    How was he explained to me that there was a website that

5    I could go to and he already had a membership on it, and he

6    told me where to find the images that he was looking for.

7    And why?  Because he wanted them.  He wanted the actual

8    pictures and videos.

9    Q.    So what did you do then upon receiving these

10   instructions about downloading these images?

11   A.    I did -- I did what he said and I put it on a memory

12   stick and then I actually sent it to him to Afghanistan

13   through a care package.

14   Q.    You saved these images into what?

15   A.    On the computer.

16   Q.    Okay.  Did you send them into -- save --

17   A.    The memory stick.

18   Q.    Okay.  And that's what you sent to him to Afghanistan?

19   A.    Yes, ma'am.

20   Q.    Okay.  Did you actually look at some of these images

21   that you were saving?

22   A.    Yes, I did.

23   Q.    Okay.  What did they depict?

24   A.    They depicted -- there was a few pictures of young girls

25   that were masturbating with a shower head and making out.

1  Q.   When you say, "young girls," what are you referring to?

2  Prepubescent girls?  How young were they?

3  A.   From my memory, they were approximately 13 or a little

4  younger.

5  Q.   And how often did you do that for him?

6  A.   Not very often.  I only sent him two sticks, two memory

7  sticks.

8  Q.   Okay.  Now, what happened when defendant got back from

9  Afghanistan?  Did he actually return to live with you?

10  A.   Yes.  I moved back to California where he was stationed

11  and we had an apartment there and he returned home that

12  Thanksgiving weekend.

13  Q.   When was that?

14  A.   2010.

15  Q.   Let me ask you, upon his return from Afghanistan, what

16  was his demeanor around the children?  What happened, if

17  anything, as relevant to this case?

18  A.   Not anything right away.  He was just kind of very

19  withdrawn when he came back; but after a time, when we moved

20  to a different town home in California, you know, he would be

21  naked around my children and he'd be masturbating in front of

22  them and he would also shower with them.

23  Q.   He would shower with both of them?

24  A.   Yes.

25  Q.   Okay.  And did you observe anything else concerning the

1    defendant's conduct with K. specifically as far as sexual

2    conduct?

3    A.    She -- she touched his penis a few times when he was

4    actually hard.

5    Q.    Okay.  You mean that he had an erect penis and he had

6    her put his -- put her hand, her little hand, on his penis?

7    A.    She just went up to it and did it.

8    Q.    Okay.  Is that something that happened on one occasion,

9    more than one occasion?  How often?

10   A.    More than once.  I can't specify how many times exactly,

11   but it happened more than once.

12   Q.    What about him masturbating in front of the children,

13   how often did that happen?

14   A.    Are you referring to -- which point?

15   Q.    When he came back from Afghanistan to live with you and

16   the children, at the time that you were together.

17   A.    Pretty frequently.  It would -- it would be random,

18   though sometimes.  It wasn't like an everyday thing.

19   Q.    Would he say anything to you about what he was doing and

20   why he was doing it or not?

21   A.    No.

22            MR. BARK:  Your Honor, I have an objection.  May we

23   approach for a moment?

24            THE COURT:  All right.

25            (Bench conference as follows.)

1          MR. BARK:  I'm objecting because --

2          THE COURT:  Make sure you speak into the

3   microphone.

4          MR. BARK:  I'm objecting because we were put on

5   notice under 404(b), 413, 414 as to molestation of M., but

6   not as to this type of conduct towards K.  We filed a motion

7   on all the other stuff, but not as to K. specifically under

8   413, 414 and 404(b).  So I'm objecting to this testimony, the

9   last question and response, and move to strike it.

10          THE COURT:  The objection is overruled.

11          (In open court.)

12          THE COURT:  You may inquire, Ms. Miranda.

13   BY MS. RIVERA MIRANDA:

14   Q.    I just want to go back for a moment to the time when you

15   were dating the defendant and you talked about him expressing

16   an interest in child pornography.  You said that you looked

17   at certain type of daddy-daughter types of communications

18   that he had on his computer.  Did he also become involved in

19   showing you child pornography?

20   A.    I mean, there was videos he had shown me and I couldn't

21   tell for sure if they were 18 or not.

22   Q.    Okay.  Did it look like young kids?

23   A.    They were young girls.  I mean, but they were like

24   between, I would say, 15 to 18.

25   Q.    Okay.

1   A.    They looked that.  You know, I didn't know for sure, but

2   they looked very young.

3   Q.    Okay.  Now, going back to what you were saying about

4   living with the defendant when he came back from deployment,

5   he lived with you for a short amount of time; would that be

6   correct?

7   A.    Yes.

8   Q.    Okay.  And then was there a point when he filed for

9   divorce?

10  A.    Yes.

11  Q.    When did that happen?

12  A.    He filed somewhere in the last week in September or the

13  first week in October, somewhere in that time period.

14  Q.    Of which year?

15  A.    Of 2011.

16  Q.    Okay.  Were you expecting that, that he would file for

17  divorce?

18  A.    I mean, we had had some contention, but I thought that

19  we would work it out; and because we had children together, I

20  assumed that he wanted to make things work.

21  Q.    Okay.  Now, when were you divorced finally?

22  A.    December 22nd of 2011.

23  Q.    Okay.  And what did you do after the divorce?

24  A.    I resided in California with my dad in a town home and

25  he moved to Texas.

31

1    Q.    Okay.  Let me ask you, after the divorce, did you stay

2    in touch with him?

3    A.    Yes, I did.

4    Q.    And how would you stay in touch with him?

5    A.    Skyping, texting, phone conversations and occasionally

6    e-mail.

7    Q.    Skyping, you mentioned.  Can you describe to the members

8    of the jury how would you do that?  What is Skype?

9    A.    Skyping is an app you can download on your computer

10   and -- you go to a website that says Skype and you download

11   the application and it enables you to have a video conference

12   with the other party.  So you're able to see each other on

13   the webcam and talk to each other.

14   Q.    Can you also --

15   A.    And you can also type messages as well.

16   Q.    Okay.  Is this a live video chat?

17   A.    Yes.  Yes, ma'am.

18   Q.    Okay.  So you used to do this with him.  How often?

19   A.    Pretty often.

20   Q.    After your divorce?

21   A.    Yes, ma'am.

22   Q.    Okay.  And then you also said that you communicated with

23   him through text messaging.  How would you do that?

24   A.    I had him programmed in my phone and I would text him

25   pictures as well as just, you know, us talking.  Usually it

```
 1   was about the kids.

 2   Q.   Okay.  Which phone did you own at the time?

 3   A.   I'm sorry?

 4   Q.   Which phone did you own at the time?

 5   A.   It would have been a Windows phone.

 6   Q.   Okay.  You had a Windows phone.  Do you own an iPhone

 7   also at some point?

 8   A.   Yes, ma'am, I do.

 9   Q.   Okay.  And you said you had him on your phone.  You mean

10   he was in your contact list on your phone?

11   A.   Yes, ma'am.

12   Q.   Under what name?

13   A.   Jon Adleta.

14   Q.   Do you know what his phone number was at the time?  Do

15   you recall that number?

16   A.   It's XXX-XXX-6155.

17   Q.   What about e-mails?  Did you communicate with the

18   defendant through e-mails?

19   A.   Yes.

20   Q.   How would you do that?

21   A.   He had a couple different e-mails.  Mainly I e-mailed

22   him sorryforhaha@Yahoo.com, and he also had another one that

23   was JAdleta@Yahoo.com.

24   Q.   For this Skype, did he have a contact name that you used

25   when you were Skyping?
```

1    A.    Yes, he did.

2    Q.    What was his contact name?

3    A.    JAdleta87.

4    Q.    Okay.  What about yours?

5    A.    Just SAdleta.

6    Q.    Okay.  Now, concerning your e-mails did you own a laptop

7    or a computer at that time?

8    A.    Yes, I did.

9    Q.    Can you describe it for the members of the jury?

10   A.    I had a lap -- a Mac laptop, an Apple Mac.

11   Q.    Okay.  Now, I'm going to ask you to please take a look

12   at Government Exhibit for identification number 20.  Do you

13   recognize it?

14   A.    Yes, I do.  That's my phone and I can tell by the

15   scratches because I actually dropped my phone within a few

16   days of buying it.

17   Q.    Okay.  Is this a phone that you used to communicate with

18   the defendant?

19   A.    Yes, it was.

20   Q.    Okay.  Does it appear to be in substantially the same

21   condition as when you last saw it?

22   A.    Yes, it is.

23   Q.    Okay.

24         MS. RIVERA MIRANDA:  Your Honor, I would now move

25   Government Exhibit 20 for identification that would be

1    admitted into evidence.

2              THE COURT:  Any objection?

3              MR. BARK:  No, Your Honor.

4              THE COURT:  Twenty will be received.

5    BY MS. RIVERA MIRANDA:

6    Q.   Now, concerning Government Exhibit 19 for

7    identification, can you please take a look at that.  I think

8    it's open on the side.  Do you recognize that?

9    A.   Yes, I do.

10   Q.   How do you recognize it?

11   A.   Because I used to borrow this.  I actually borrowed it

12   from a friend of mine.

13   Q.   To do what?

14   A.   To Skype.

15   Q.   With whom?

16   A.   Aaron Dixon and Jonathan Adleta.

17             MS. RIVERA MIRANDA:  Your Honor, we now move

18   Government Exhibit 19, that it be admitted into evidence.

19             THE COURT:  Mr. Bark?

20             MR. BARK:  No objection.

21             THE COURT:  It'll be received.

22   BY MS. RIVERA MIRANDA:

23   Q.   Now, I'm going to ask you to take a look at Government

24   Exhibit 25 for identification.  Do you recognize it?

25   A.   Yes, I do.

1    Q.    How do you recognize it?

2    A.    This camera used to belong to Jonathan.

3    Q.    Okay.  Did you use that camera to take pictures, family

4    pictures?

5    A.    Yes, ma'am.

6    Q.    Does it appear to be in substantially the same condition

7    as when you last saw it?

8    A.    Yes, it is.

9              MS. RIVERA MIRANDA:  Your Honor, I would now move

10   Government Exhibit 25 for identification into evidence.

11             THE COURT:  Mr. Bark.

12             MR. BARK:  No objection.

13             THE COURT:  It'll be received.

14             MS. RIVERA MIRANDA:  Your Honor, may we publish

15   these three exhibits.

16             THE COURT:  Yes.

17             MS. RIVERA MIRANDA:  May we approach the witness,

18   Your Honor?

19             THE COURT:  Yes.

20   BY MS. RIVERA MIRANDA:

21   Q.    Now, this is Government Exhibit 20.  Can you please tell

22   the members of the jury what is this?

23   A.    That is my phone, my iPhone.

24   Q.    Okay.  Is this the phone that you were referring in your

25   testimony that you were using to communicate with the

36

1    defendant?

2    A.    Yes, ma'am.

3    Q.    Okay.  Now, what happened with the Windows phone?  You

4    said you had a Windows phone also?

5    A.    It -- the battery got swollen, so I couldn't actually

6    cover the back of the phone.  So I had to buy this phone so I

7    could have one that worked.

8    Q.    So that one stopped working, the Windows phone?

9    A.    Yes, ma'am.

10   Q.    Okay.  I'm showing you Government Exhibit 25.  What is

11   this?

12   A.    Jonathan's camera.

13   Q.    Okay.  A Casio camera?

14   A.    Yes.

15   Q.    And what is this?

16   A.    This is my laptop or the one I borrowed.  It was in my

17   possession.

18   Q.    The one you used to communicate with the defendant?

19   A.    Uh-huh.

20   Q.    Okay.  Let me go back to your testimony about when the

21   defendant was deployed.  You testified that K. was two and a

22   half years old, but can you go back and maybe think about

23   that.  You said she was born in March of 2009, right?

24   A.    Uh-huh.

25   Q.    And he was deployed in May of 2010?

1   A.   Uh-huh.

2   Q.   So how old was she when he was deployed?

3   A.   She was a year and a half.  I'm sorry.

4   Q.   Okay.  Now, you explained that you communicated with the

5   defendant through these means, media devices.  Can you please

6   tell the members of the jury about the substance of these

7   communications with the defendant about after your divorce as

8   they pertain to this case?

9   A.   Well, we would -- we would text back and forth and we

10   would Skype a lot and he would talk about his interest in

11   child pornography.  He obviously didn't state it like that,

12   but he showed me pictures and videos.

13   Q.   Of what?

14   A.   Of child pornography.

15   Q.   Okay.  And did he express -- I'm talking this is now the

16   year 2012, right, when you're communicating with the

17   defendant through Skype and text messaging and e-mails.  Did

18   you at any point start having communications about K. and

19   about his sexual interest in K.?

20   A.   Yes, we did.  We did discuss it through text as well as

21   on the phone, and he had expressed his curiosity with my

22   daughter.

23   Q.   Curiosity about what?

24   A.   Her engaging in sexual activity with him, such as giving

25   him a blow job or touching his penis.

38

1    Q.    Okay.  And did you talk at some point how was this going

2    to happen if he was going to see the children eventually at

3    some point?

4    A.    Yes, we did.  We spoke and he wanted to spend time with

5    the kids at Christmastime.

6    Q.    Okay.  Now, let me -- before then, did there come a

7    point in time during your communications with the defendant

8    that you told him about you performing sexual acts on K. and

9    taking pictures and videotaping this?

10   A.    Yes.

11   Q.    Okay.  So please describe to the members of the jury

12   what did you tell him and what was his response?

13   A.    I told him that -- that I had been making out with my

14   daughter and that I had my tongue in her mouth and that I had

15   partially entered -- inserted my finger into her vaginal

16   area, and I also gave her oral sex in her vaginal area.

17   Q.    Why did you do that?

18   A.    Because Aaron Dixon wanted me to.

19   Q.    This is the other person you were talking about?

20   A.    Uh-huh.

21   Q.    Okay.  And were you photographing or videotaping these

22   acts?

23   A.    Yes.

24   Q.    What was defendant's response when you told him about

25   these things that you were doing with your children?

```
 1   A.    He seemed interested in it.

 2   Q.    Okay.  Did he ask you for pictures of the sexual abuse

 3   on your children, on K. specifically?

 4   A.    Yes.

 5   Q.    Okay.  And did you actually send him those pictures?

 6   A.    Yes, I did.

 7   Q.    Okay.  How do you do that?

 8   A.    Through text message.

 9   Q.    Okay.  And you said that you had oral sex with K., that

10   you performed oral sex on her.  How often -- how many times

11   did you do that?

12   A.    Less than six times.

13   Q.    Did you tell the defendant about that?

14   A.    Yes, I did.

15   Q.    And what was his response to that?

16   A.    He actually seemed to like the idea of it.

17   Q.    Okay.  Now, you said that at some point he indicated

18   that he would want to have the kids travel for Christmastime.

19   At the time when he mentioned this, can you tell the members

20   of the jury when exactly -- about what time was it?  Was this

21   October, November?  When was it in the year that he mentioned

22   that?

23   A.    More towards the end of November, in the December area.

24   Q.    Okay.  That he wanted to have K. travel?

25   A.    As well as my son.
```

1   Q.   Okay.   Where?

2   A.   To his home in Glenpool, Oklahoma.

3   Q.   And where were you living at the time?

4   A.   I was residing in Oviedo, Florida.

5   Q.   Okay.   Now, when you talked about the possibility of the

6   kids traveling, did the defendant mention what exactly he

7   wanted to do with K. when she visited?

8   A.   And he said he was curious of performing -- well, he was

9   curious of doing some things with her sexually and he wanted

10  to video it.

11  Q.   Okay.   What things did he want to do with K.?

12  A.   He wanted to give her a "facial" and then he also wanted

13  her to touch him and suck on his penis.

14  Q.   Did he use the word "suck" on his penis?

15  A.   It was something along that nature.

16  Q.   Okay.   So he wanted oral sex from K. and also to

17  masturbate on her?

18  A.   Yes.

19  Q.   Okay.   And did he ask you if you were okay with this?

20  A.   Yes.

21  Q.   And what did you say?

22  A.   I said yes.

23  Q.   So you agreed to have the defendant have K. travel from

24  Oviedo, Florida, to Oklahoma so that he could perform these

25  sex acts on her?

```
 1   A.    Yes.

 2              MR. BARK:  Objection to leading.

 3              THE COURT:  Sustained.

 4   BY MS. RIVERA MIRANDA:

 5   Q.    Okay.  Now, at some point after this conversation about

 6   the possibility of having K. travel to Oklahoma, is there any

 7   coordination of this travel?

 8   A.    Yes.  He -- he gave me his credit card information and I

 9   went and booked the flights.

10   Q.    Okay.  Now, you said he gave you his credit card

11   information.  Do you recall which credit card?

12   A.    It was a MasterCard.

13   Q.    Okay.  With which bank, if you remember?

14   A.    It was the military banking.  I believe it's U.S.S.A.

15   (sic) I believe.

16   Q.    Something to that effect?

17   A.    Something to that nature.

18   Q.    And at the time did you have financial means to buy

19   those tickets?

20   A.    Absolutely not.

21   Q.    Okay.  So how did you go about making this reservation?

22   A.    I -- he text messaged his credit card information and

23   then I went online and I purchased the tickets.

24   Q.    For when did he make the reservation?

25   A.    I think it was approximately a week and a half before
```

42

1    the departure.

2    Q.    Okay.  And do you recall which airline did you use?

3    A.    No, I do not.

4    Q.    Okay.  Now, regarding the sex acts that he indicated he

5    wanted to perform on K., is there anything else he said as to

6    what he wanted to do or whether he wanted to record those

7    acts?

8    A.    He had said that he wanted to video some of the things

9    and he said to remind him to charge his battery for it.

10   Q.    He wanted to video record the sexual activities with K.?

11   A.    Yes.

12   Q.    Okay.  Now, the reservation -- you made the reservation

13   for which dates?

14   A.    I believe it was either the 22nd or the 23rd.

15   Q.    Of which month?

16   A.    December.

17   Q.    Of the year 2012?

18   A.    That was when I flew out.

19   Q.    Okay.  Was there a return trip that was also reserved

20   with this?

21   A.    Yes, it was a roundtrip ticket.

22   Q.    It was a roundtrip ticket.  Okay.  So did you, in fact,

23   travel on December 23rd?

24   A.    Yes, I did.

25   Q.    Okay.  And who traveled with you?

43

1    A.    My son and my daughter with me.

2    Q.    Okay.  And let me ask you, who picked you up at the

3    airport?

4    A.    Jonathan.

5    Q.    Okay.  Where did you stay during that time?

6    A.    At his house.

7    Q.    Okay.  Where was he living at the time?

8    A.    He was living in Glenpool, Oklahoma.

9    Q.    Okay.  Now, let me ask you, around this time did the

10   defendant have a girlfriend?

11   A.    Yes.

12   Q.    You know her name?

13   A.    Samantha Bryant.

14   Q.    Did you meet her at some point?

15   A.    Yes, I did.

16   Q.    Are you aware whether she has any children?

17   A.    Yes.

18   Q.    Okay.  How old are they, if you know?

19   A.    Approximately three and I think the other child was

20   about four or four and a half, somewhere in that age.

21   Q.    Are you aware whether the defendant had access to the

22   children?

23   A.    Yes.

24   Q.    How so?

25   A.    Because when I would Skype, I could hear the children in

44

1    the background.

2    Q.    Okay.  Now, during your conversations with the

3    defendant, did anything come about concerning Bryant's little

4    daughter?

5    A.    Yes.

6    Q.    Please explain to the jury.

7    A.    He had made a comment to me, explaining that M. or her

8    daughter's ass was cuter than my daughter's, that she had a

9    hot body.

10   Q.    He told you that?

11   A.    Yes, ma'am.

12   Q.    Okay.  Now, when you arrived to Oklahoma on December

13   23rd, 2012, was Bryant staying with the defendant?  Was she

14   at the house?

15   A.    She was not at the house when we first arrived.

16   Q.    She arrived later then?

17   A.    Yes, ma'am.

18   Q.    Do you recall more or less when was it that she arrived

19   to the house in Oklahoma?

20   A.    It was approximately the 25th or the 26th.

21   Q.    Okay.  Did she arrive alone or was she accompanied by

22   others?

23   A.    She had her children with her.

24   Q.    Okay.  Now, did you all stay together at the house for

25   that period of time since she arrived until your departure?

1  A.   Yes.

2  Q.   Okay.  Now, let me ask you, what happened during your

3  stay at the defendant's house in Oklahoma as it pertains to

4  K.?

5  A.   Within the first day and a half or so I was in his

6  bathroom area, master bathroom, and he was in his bedroom and

7  my daughter was in there as well, and he said, "Sarah, come

8  here," and I came into his room and he was laying on the bed

9  and he didn't have a shirt on and he had been playing with

10  himself, and my daughter was in the same vicinity, very close

11  to him on the bed.

12  Q.   What do you mean that he was "playing with himself"?

13  A.   Meaning he was rubbing his penis.

14  Q.   Was he masturbating?

15  A.   Yes, ma'am.

16  Q.   Okay.  And you said your daughter was where?

17  A.   On the bed with him.

18  Q.   Okay.  Was she awake or asleep?

19  A.   She was awake.

20  Q.   Okay.  And how was she dressed at the time or was she

21  dressed, if she was dressed at all?

22  A.   She wasn't wearing a shirt.

23  Q.   Okay.  So what was she wearing?

24  A.   I believe she was wearing just her panties and a pullup.

25  Q.   And then what happened?

 1   A.    She -- she -- he had her lay down and he ejaculated on

 2   her chest.

 3   Q.    Okay.  Can you describe the events that led to that, to

 4   him ejaculating on her chest, on K.'s chest?

 5   A.    Yes.  She had sat down -- when he was laying down, she

 6   was right on top of him and she was sitting there, and then

 7   that's when he had her lay down next to him and she freaked

 8   out.

 9   Q.    Where was she sitting exactly when he had her on top of

10   him?

11   A.    She was laying on the bed and he -- he was -- he was

12   kind of like -- her body was laying this way and then he was

13   on the side.  So he could actually ejaculate on her chest

14   area.

15   Q.    You said he had her sit on him?

16   A.    Yes.  That was in the beginning.

17   Q.    Okay.  What was he doing in the beginning with her?

18   A.    She -- he was just cuddling with her.

19   Q.    How was he cuddling her?

20   A.    Meaning that he had his hands on her, you know, just on

21   her back area.

22   Q.    Where on her back area?

23   A.    Like here (demonstrating), right above her ass.

24   Q.    And as he was touching her, what was he doing?

25   A.    Well, his penis was already hard at that point.  So he

1    was just -- she was just sitting there, you know, and then it

2    happened really fast.

3    Q.   And from there, what happened?  He had her sitting on

4    him, and then what happened?

5    A.   Then he had her lay down on the bed and then she -- she

6    didn't -- she seemed very resistant, but he just kept doing

7    it and --

8    Q.   What did he keep doing?

9    A.   He was about to come on her, on her chest area,

10   ejaculate, and she was really upset.

11   Q.   And when you said she was really upset, how was she

12   acting?

13   A.   She was just frightened.

14   Q.   Okay.  What happened when he ejaculated on her chest?

15   A.   She just -- she whined and she just didn't like it.

16   Q.   And what were you doing as this was happening?

17   A.   Watching it all and doing nothing about it.

18   Q.   After he ejaculated on her chest, what happened with K.?

19   A.   They just -- he went and cleaned himself up and then

20   she -- she -- he cleaned her off, I believe, and then just

21   went on with the day.

22   Q.   Okay.  Now, did you videotape this?

23   A.   No, I did not.

24   Q.   Okay.  Or take pictures or anything like that?

25   A.   No.

1    Q.    Okay.  Now, let me ask you, after this incident, was

2    there anything else that happened in that house while you

3    were staying there in Oklahoma?

4    A.    There is another occasion where one of the nights I was

5    there, his girlfriend and him had an argument and so they

6    were not seeing eye to eye.  So she was out in the living

7    room with me and we were drinking some Smirnoffs and we were

8    staying out pretty late, but my daughter wanted to snuggle

9    with Jonathan and so he -- he brought her into his room and

10   she was laying there with, you know, her blanket and so forth

11   and --

12   Q.    Where was she lying?

13   A.    Next to him.

14   Q.    Okay.  On the bed?

15   A.    On the bed with him.

16   Q.    Okay.

17   A.    And they ended up making out that night and I was

18   watching more of the TV that was on, and somewhere between

19   1:30 and 2:00 in the morning I'm turning off the TV to go lay

20   down in the other bedroom and I hear her moaning.

21   Q.    Who's moaning?

22   A.    Samantha.

23   Q.    So this is when Samantha Bryant is at the house?

24   A.    Yes, ma'am.

25   Q.    With her kids?

1   A.   Yes, ma'am.

2   Q.   Okay.  You hear her moaning and that's coming from

3   where?

4   A.   His bedroom.

5   Q.   Okay.  And what do you understand by that?  What's going

6   on?

7   A.   They were having sexual intercourse.

8   Q.   And where's K.?

9   A.   I thought she was in the bedroom.

10  Q.   And what about the other kids that were in the house,

11  where are they?  Your son, J.?

12  A.   My son was in the other bedroom, the kids' room.

13  Q.   Okay.  And what about Bryant's kids?

14  A.   They were laying on the floor on a mattress.

15  Q.   On the floor where, which bedroom?

16  A.   In the master bedroom where he was at.

17  Q.   Where he was at with Bryant?

18  A.   Yes.

19  Q.   And your daughter?

20  A.   Uh-huh.

21  Q.   So, upon listening to this, and you heard this moaning,

22  what did you do, if anything?

23  A.   I got very angry and I came to his door and banged on it

24  and I said, "Get your ass out of here.  We need to talk."

25  And, of course, he was really upset with me.

50

1      I said, "You're not going to do that in front of

2  my daughter."

3  Q.   You told him that?

4  A.   Uh-huh.  And so they had gotten dressed, both of them,

5  and I had talked to Samantha in the kitchen and she said, you

6  know, "That shouldn't have taken place."  She said by the

7  time --

8      MR. BARK:  Objection; non-responsive to the

9  question.

10      THE COURT:  Sustained.

11  BY MS. RIVERA MIRANDA:

12  Q.   Okay.  Where was K. when this happened, at the time that

13  you intervened, that you said that "This shouldn't happen"?

14  A.   She was still on the bed laying down.

15  Q.   Was she asleep?  Was she awake?

16  A.   She was half in and half out.

17  Q.   Okay.  And you spoke with the defendant about the

18  incident?

19  A.   Uh-huh.

20  Q.   And what was his reaction to that?

21  A.   He was angry at me because I invaded his privacy by

22  opening the door.  I didn't see anything.  I just opened it a

23  crack.

24  Q.   Okay.  And what happened with K.?

25  A.   I picked her up and I brought her to the kids' room and

1    laid her on the bed and was just, you know, trying to get her

2    to go back to sleep.

3    Q.   What was she wearing at that time when you brought her

4    out of the room?

5    A.   She was wearing PJs.

6    Q.   Okay.  Now, let me ask you if there were any other

7    incidents at this house in Oklahoma?

8    A.   The only other incident is one of the afternoons when I

9    was there, the kids were all playing in the living room and

10   he was sitting on the couch and I was across from him sitting

11   in a chair and he had a blanket on top of him and I could

12   tell he was masturbating slash rubbing his dick, and he was

13   watching the kids play.

14   Q.   He was masturbating under the blanket?

15   A.   Yes, ma'am.

16   Q.   And how could you tell?

17   A.   It was very obvious.  I had seen him do it before, not

18   at that particular house but before.

19   Q.   And where were the kids?

20   A.   They were just out playing.

21   Q.   And what was he looking at as he was masturbating?

22   A.   Them.

23   Q.   At the kids?

24   A.   Yes, ma'am.

25   Q.   Okay.  Now, regarding your conversations with the

1   defendant when you were there in Oklahoma, is there anything

2   else that he mentioned regarding K., any other incident?

3   A.   No.

4   Q.   What about any incidents concerning the shower?

5   A.   Oh, he did tell me after that occasion happened with the

6   "facial," that he had told me that he had taken a shower with

7   her and while they were in the shower together, she had given

8   him -- was giving him head.

9   Q.   He told you this when?

10  A.   Right after the incident happened, within that -- of him

11  ejaculating on my daughter.

12  Q.   So he told you he had taken a shower with your daughter?

13  A.   Yes.

14  Q.   And while they were in the shower --

15       MR. BARK:   Objection; leading.

16  BY MS. RIVERA MIRANDA:

17  Q.   -- what happened?

18       THE COURT:   Sustained.

19       Don't recast or restate the witness's testimony.

20  Just ask questions, Ms. Miranda.

21       MS. RIVERA MIRANDA:   Yes, Your Honor.

22  BY MS. RIVERA MIRANDA:

23  Q.   What happened while they were in the shower?  Did he

24  describe it in more detail?

25  A.   He just said that she had his (sic) mouth on his penis.

1   Q.   You used the term "giving him head."  What do you mean

2   by that?

3   A.   I'm meaning that the mouth is on the actual penis.

4   Q.   K.'s mouth?

5   A.   Yes, ma'am.

6   Q.   Did he tell you what was her reaction to that, what was

7   he doing, whether he ejaculated?

8   A.   He didn't tell me very much at all.

9   Q.   Okay.  Now, when exactly was it that you returned to

10  Florida?

11  A.   Approximately January 2nd.

12  Q.   Okay.  And when you returned to Florida, did you come

13  back with an understanding that you would continue to molest

14  the children?

15  A.   Yes.

16  Q.   For what purpose?

17  A.   For -- well, Aaron wanted to continue Skyping and

18  pictures, and Jonathan wanted to still -- he was still

19  curious of doing things with my daughter.

20  Q.   Okay.  So, after your return, you said he was curious of

21  doing things with your daughter, meaning what?  Let me just

22  clarify that.  Curious of doing what?

23  A.   Performing in sexual activity, such as her giving him

24  head.

25  Q.   Okay.  Do you mean oral sex?

1    A.    Yes, ma'am.

2    Q.    Okay.  Now, let me ask you, after your return from

3    Oklahoma, you continued communicating with the defendant and

4    you said yes.  Was there any discussion about when he was

5    going to see the children again?

6    A.    Yes.  We had talked about the summertime of this year.

7    Q.    What was going to happen in the summertime?

8    A.    He was going to spend time with the kids.

9    Q.    Okay.  Was there any conversation about having the kids

10   for longer periods of time?

11   A.    Yes, ma'am.

12   Q.    What were the conversations about?

13   A.    He wanted to have the kids for two to three weeks at a

14   time and I was completely against it and I said, "You're

15   not -- you're not going to have it," and even though we

16   shared 50/50 custody.

17   Q.    So there was some conversation about having the kids

18   travel back to Oklahoma and staying with him for some time?

19   A.    Yes, ma'am.

20   Q.    And what was it that you were not comfortable with?

21   A.    I wasn't comfortable with my children being alone with

22   him and I didn't know how he could take care of them with him

23   working full time.

24   Q.    Okay.  But were you expecting the kids to go back at

25   some point, still stay with him?

1    A.    Yes, ma'am.

2    Q.    Okay.  Now, after your return from Florida, were there

3    any other additional conversations regarding what happened --

4    A.    Yes, ma'am.

5    Q.    -- in December --

6    A.    Uh-huh.

7    Q.    -- 2012 --

8    A.    Yes, ma'am.

9    Q.    -- in Oklahoma?

10          Can you please describe those to the members of

11   the jury?

12   A.    We -- we were Skyping and we were exchanging a

13   conversation through typing back and forth about the

14   incident.  I had asked him why he hadn't taken videos of it

15   and why he didn't do more.

16   Q.    Why did you ask that?

17   A.    Because Aaron Dixon wanted me to get the videos for him.

18   Q.    Videos of what?

19   A.    Of Jonathan with my daughter performing in sexual

20   activities.

21   Q.    Okay.  And what was his response to that?

22   A.    He -- he liked the idea of it and he supported it.

23   Q.    Okay.  When you asked him that, why he had not done more

24   things or videotaped what happened with K. at the house in

25   Oklahoma, what was his response to that?

1    A.    Can you re. . .

2    Q.    When you asked him about why he had not done more things

3    with K. in Oklahoma, what was his response to that?

4    A.    "I don't know."

5    Q.    He said, "I don't know"?

6    A.    Uh-huh.

7    Q.    Okay.  And then regarding K.'s reaction to what happened

8    in the room when he ejaculated on her chest, were there any

9    conversations about that?

10   A.    Yes, ma'am.

11   Q.    Okay.  Can you please tell the members of the jury.

12   A.    Him and I were talking back and forth, typing on the

13   Skype, and we were -- I was commenting on -- he talked about

14   her freaking out, and I said, "Well, if she's anything like

15   me, then, you know, over time she'll -- she'll like it."

16   Q.    That's what you said?

17   A.    Yes, ma'am.

18   Q.    Okay.  And did he suggest you do anything at all to make

19   her not freak out --

20   A.    Yes.

21   Q.    -- the next time?  What did he say?

22   A.    He wanted someone or anyone, really, to actually

23   ejaculate on her.

24   Q.    He wanted someone to ejaculate on her?

25   A.    Yes, ma'am.

1    Q.    For what purpose?

2    A.    To get pictures of it or videos.

3    Q.    Someone ejaculating on K.?

4    A.    Uh-huh.

5    Q.    And did he suggest anyone to do this to K.?

6    A.    Yes.

7    Q.    Who did he suggest?

8    A.    There was a gentleman that I was dating.  His name was

9    Matt, and I had sent a picture of him to him so he actually

10   had an idea of what he looked like, and he -- he really

11   wanted him to do things with my daughter.

12   Q.    And what was the purpose behind having other men

13   ejaculate on your daughter, do things to your daughter?

14   A.    So she would get more comfortable with it and she would

15   like it.

16         MS. RIVERA MIRANDA:  Your Honor, if I can have a

17   moment?

18         THE COURT:  Yes.

19   BY MS. RIVERA MIRANDA:

20   Q.    You said that defendant would -- you would Skype with

21   defendant and defendant would masturbate over Skype?

22   A.    Yes, ma'am.

23   Q.    Okay.  When this happened, would he ask you to do

24   something specifically as he was doing this?

25   A.    No.

58

1   Q.    What about your children?

2   A.    He -- most of the intentions of the Skyping were for him

3   to talk to the kids and, of course, he would -- he would call

4   on my daughter or my son to come look and there were some

5   occasions where he was already masturbating in front of my

6   child, K., my daughter.

7   Q.    That was through Skype?

8   A.    Yes, ma'am.

9   Q.    And when did that happen?

10  A.    It happened even before the trip, but after the trip as

11  well through -- you know, it wasn't really frequent, but

12  it -- every so often.

13  Q.    So do you mean during the year 2012 and then after your

14  return from the trip on January 2nd, 2013?

15  A.    Yes, ma'am.

16  Q.    And you also mentioned that you saw him masturbating

17  under the covers while you were at his house in Oklahoma in

18  December of 2012.  You said that you had seen him do this

19  before.  When was that?

20  A.    Of 2011, the year 2011.

21  Q.    And where were you at when this happened?

22  A.    It would be at our house that we were staying at.

23  Q.    He was masturbating under the covers when you guys were

24  living together --

25  A.    Yes.

1    Q.    -- is that what you're saying?  Can you please describe

2    to the members of the jury what happened?

3    A.    There would be different occasions where, you know, the

4    TV would be on and the kids would be playing and he would

5    just start masturbating underneath the blanket.

6    Q.    Okay.  So you could tell that this was happening?

7    A.    Yes.

8    Q.    And what was he look at as he was doing this?

9    A.    At the children or at the TV area.

10   Q.    Now, concerning these communications with the defendant

11   about the abuse that you were doing and taking pictures for

12   Aaron Dixon, did he ask for pictures of that abuse?

13   A.    Yes, he did.

14   Q.    And did you -- and what did you do about that when he

15   asked for them?

16   A.    Can you. . .

17   Q.    If he asked for pictures of the abuse, did you actually

18   send him pictures of the abuse?

19   A.    Yes.

20   Q.    Okay.  How many occasions did you do that?

21   A.    Only a few.

22   Q.    A few occasions?

23   A.    Uh-huh.

24   Q.    Okay.  Now, once you got back and you had certain

25   conversations with the defendant about having the kids for

60

1    longer periods of time, was that just a matter of

2    coordinating the -- how long those periods were going to be,

3    when was -- when was he going to have the kids back in

4    Oklahoma?

5    A.    Can you -- can you ask the question again?

6    Q.    Okay.  Were you okay with the kids going back to

7    Oklahoma and seeing him and visit with him after the trip in

8    December and you understood the kids were going to return to

9    Oklahoma at some point and see their father?

10   A.    I mean, I -- I was somewhat okay with it because I knew

11   that he had custody.  So I couldn't do much about that.

12   Q.    So you were discussing that?

13   A.    Yes, ma'am.

14   Q.    Okay.  Now, regarding your communications through Skype,

15   you already describe how they took -- can you please take a

16   look at Exhibit for Identification Number 2.

17   A.    Uh-huh.

18   Q.    Do you recognize it?

19   A.    Yes, I do.

20   Q.    How do you recognize it?

21   A.    It's my conversation that I had with Jonathan through

22   Skype.

23   Q.    Do you recognize your user name and his user name in

24   these conversations?

25   A.    Yes, ma'am.

1   Q.   Okay.

2            MS. RIVERA MIRANDA:  Your Honor, we're now moving

3   Government Exhibit Number 2 for identification be admitted

4   into evidence.

5            THE COURT:  Mr. Bark.

6            MR. BARK:  May I have one moment, Your Honor?

7            THE COURT:  Yes.

8            (Discussion off the record between Mr. Bark and the

9   defendant.)

10            MR. BARK:  No objection, Your Honor.

11            THE COURT:  All right.  It'll be received.

12            MS. RIVERA MIRANDA:  Your Honor, may we publish the

13   exhibit?

14            THE COURT:  Yes.

15            MS. RIVERA MIRANDA:  That would be Bates stamp 170.

16   Okay.  Can we just zoom on the top half.

17   BY MS. RIVERA MIRANDA:

18   Q.   Now, what did you say was defendant's user name?

19   A.   JDAdleta87.

20   Q.   And what was your user name?

21   A.   SAdleta.

22   Q.   Okay.  Now, going to that first line, 383, it says, "I

23   like hearing them in the background," okay.  Who wrote that?

24   A.   Jonathan.

25   Q.   Okay.  And who is he referring to here?

62

1    A.    Our children.

2    Q.    Okay.  And your response was that "They are cute"?

3    A.    Yes, ma'am.

4    Q.    Okay.  And what did he say next?

5    A.    He said, "I'm still scared, but I do want to try

6    things."

7    Q.    What was the defendant referring to when he said, "I do

8    want to try things"?

9    A.    He was referring to sexual activity with children.

10   Q.    And this was on October 1st, 2012; would that be

11   correct?

12   A.    Yes, ma'am.

13   Q.    Okay.  And then if you go to line 388, what was your

14   response to that?

15   A.    I'm sorry.  What line?

16   Q.    Three eight eight.

17   A.    I said, "I would be extremely careful."

18   Q.    Okay.  And what was his response in line 389?

19   A.    "Well, I'm not doing anything unless it's talking to you

20   about it."

21   Q.    Is this how you guys operated, that you would

22   communicate about doing these kind of things with the

23   children?

24   A.    Yes, ma'am.

25   Q.    Okay.  Now, going to line 392, that would be the bottom

```
1    half, what did the defendant say?

2    A.    On 392?

3    Q.    On 392.

4    A.    "I'm not going and trying to talk to anyone I don't

5    know."

6    Q.    Okay.  And then in line 394 what did he say?

7    A.    "Have you done anything with them?"

8    Q.    What was he referring to by that?

9    A.    He was referring to if I --

10            MR. BARK:  Your Honor, I object as speculation.

11            MS. RIVERA MIRANDA:  Your Honor, may we approach?

12            THE COURT:  If you can establish how she knows.

13   The objection is sustained at the moment.

14   BY MS. RIVERA MIRANDA:

15   Q.    Okay.  When -- in that line, 394, "Have you done

16   anything with them," do you know what he was referring to?

17   A.    Yes, ma'am.  Yes, I do.

18   Q.    How do you know?

19   A.    Because this is how we talked back and forth.

20   Q.    Now, what was he referring to?

21            MR. BARK:  I have the same objection, Your Honor.

22            THE COURT:  Overruled.

23   BY MS. RIVERA MIRANDA:

24   Q.    What was he referring to?  What was he referring to when

25   he said, "Have you done anything with them"?
```

```
 1   A.    Meaning if I had any sexual activity with either one of

 2   the kids.

 3   Q.    Okay.  And your response in line 395 was what?

 4   A.    "Nope."

 5   Q.    Okay.  And then you said -- in line 396, what did you

 6   say then?

 7   A.    "Because of my stupid rash."

 8   Q.    Okay.  Then in line 399, it says, "Does she know about

 9   it?"  What is that about when you say, "Does she know about

10   it"?

11   A.    Samantha Bryant.

12   Q.    What did she know about?

13   A.    About his -- his interest in child pornography.

14   Q.    Okay.  In line 400, what was his response?

15   A.    "My girlfriend?"

16   Q.    Okay.  And then in line 402, what was his response?

17   A.    "No."

18   Q.    Okay.  In line 403, when you say, "No, I haven't.  Most

19   I do is make out with her," what were you referring to there?

20   A.    I was referring to making out with my daughter.

21   Q.    So basically are you answering that question in line

22   394, "Have you done anything with them," and I see on line

23   403 you say, "No, I haven't.  Most I do is make out with

24   her"?

25   A.    Yes, ma'am.
```

65

1    Q.    Okay.  And his response to that was?

2    A.    "Do you really?"

3    Q.    Okay.  And in line 405 you said, "Yeah.  She loves it."

4          In line 406 it says, "She wants it."  Who are you

5    referring to here?

6    A.    My daughter.

7    Q.    How old was she at this time?

8    A.    She would have been three and a half or so.

9    Q.    And what was his response to that when you said, "She

10   wants it," in line 407?

11   A.    His response was, "Ha, ha.  Let me see."

12   Q.    And this was over Skype?

13   A.    Yes, ma'am.

14   Q.    And let me ask you then what did he say in line 409?

15   A.    "What happens if you kiss her chest?"

16   Q.    Okay.  And what was her response to that in 410?

17   A.    "She isn't into it at the moment," -- or, "moment."

18   Q.    Why did you say that?

19   A.    Because she was watching a movie or she was playing.

20   Q.    And in line 412, you said, "But she wants to kiss me,

21   like, at least six times a day," and what was his response to

22   that in line 413?

23   A.    He says, "Ha, ha.  Kiss for long or is it just real

24   quick?"

25   Q.    Okay.  And your response in line 414?

1    A.    "Varies."

2    Q.    In line 415, what did you say?

3    A.    "She usually wants long ones."

4    Q.    What did you mean by "long ones," that "She usually

5    wants long ones"?

6    A.    A long kiss.

7    Q.    And what is that?  What did you used to do with K.?

8    A.    I used to kiss her for -- on her lips for some length of

9    time on occasions.

10   Q.    Did you actually put your tongue in her mouth?

11   A.    Yes.

12   Q.    And this happened on more than one occasion?

13   A.    Yes.

14   Q.    Okay.  In line 418, you said, "Maybe she will be bi."

15   What did you mean by that?

16   A.    Meaning that my daughter would be bisexual.

17   Q.    Okay.  And in line 421, he said, "She looks great."

18   When the defendant said, "She looks great," who is he

19   referring to?

20   A.    My daughter.

21   Q.    Then in line 423, he asks you, "Have you looked at

22   anything?"  What does he mean by that?

23   A.    Any pictures of child pornography.

24   Q.    Okay.  In line 425, you say, "I'm waiting to talk to

25   that guy."  Who are you referring to?

1    A.    Aaron Dixon.

2    Q.    So you were waiting to talk to Aaron Dixon about what?

3    A.    Pictures and videos of child pornography.

4    Q.    Okay.  That's why you said in 426, "He has a lot,"

5    meaning what?

6    A.    He had a lot of videos and a lot of pictures.

7    Q.    Okay.  And in 428 what was the defendant's response?

8    A.    "Just pictures?  Or videos, too?  Is it good stuff?"

9    Q.    And your response in 429 was, "Everything."

10             Okay.  On line 430, what else do you say?  "I

11   have seen a lot of videos"?

12   A.    Yes.

13   Q.    What do you mean by that?  Videos of what?

14   A.    Of fathers molesting their children or their daughters.

15   Q.    Who was showing you those videos?

16   A.    I'm sorry?

17   Q.    Who was showing you those videos?

18   A.    Aaron Dixon.

19   Q.    Okay.  And in 432 you said, "On mirror."  What do you

20   mean by, "On mirror"?

21   A.    He had a mirror on his wall, and I told him I wasn't

22   comfortable with looking at the website.  So he would play

23   the actual video and then put the mirror where I could

24   actually see the video.

25   Q.    So when you say, "he," are you referring to Aaron Dixon?

1    A.    Yes, ma'am.

2    Q.    And then in 435 what was the defendant's statement?

3    A.    "I'm sorry, but I'm really curious and I wish I could

4    see."

5    Q.    Okay.  And then you said in line 436, "I should text you

6    that."  Why do you say that?

7    A.    Because I knew it was illegal.

8    Q.    So would you rather text than Skype?  I mean, is there a

9    particular reason why you say this?

10   A.    It was just easier, too, for me just to text it.

11   Q.    Okay.  And then in line 438 it states, "Can't delete

12   conversations on Skype really well."  Is that why you -- what

13   you were referring to?

14   A.    Yes, ma'am.

15   Q.    Okay.  And on line 443 it states that, "Wish I could

16   see."  What is he referring to?

17   A.    Child pornography.

18   Q.    Okay.  Now, can you please take a look at Exhibit 26 for

19   identification.

20   A.    I don't see it.

21         MS. RIVERA MIRANDA:  Your Honor, if I can approach

22   the witness?

23         THE COURT:  You can approach.

24   BY MS. RIVERA MIRANDA:

25   Q.    Please take a look at this.  Do you recognize that?

1    A.    Yes, I do.

2    Q.    How do you recognize it?

3    A.    It's text messages Jon and I exchanged back and forth.

4    Q.    Okay.  Before, you said that you had him on your contact

5    list on your phone?

6    A.    Yes.

7    Q.    Under what name?

8    A.    Jon Adleta or Jonathan.

9    Q.    Now, do you recognize his phone number on this Exhibit

10   26 for identification?

11   A.    Yes, I do.

12   Q.    Okay.

13             MS. RIVERA MIRANDA:  Now, Your Honor, we're

14   offering Exhibit 26 for identification into evidence.

15             THE COURT:  Mr. Bark?

16             MR. BARK:  No objection.

17             THE COURT:  It'll be received.

18             MS. RIVERA MIRANDA:  May we publish it, Your Honor?

19             THE COURT:  Yes.

20             MS. RIVERA MIRANDA:  May we retrieve the document?

21             THE COURT:  Yes.

22   BY MS. RIVERA MIRANDA:

23   Q.    Now, on that first line, where it says, "Outgoing:  J.

24   Is using potty again," who writes that?

25   A.    That is me.

1   Q.    Okay.  And what does it say on the next line?

2   A.    "I did get a new phone.  So if you want to Skype, let me

3   know."

4   Q.    Then in line 33 what do you say?

5   A.    "I don't want to fight, Jon.  I don't want the kids to

6   be put in the middle.  How would two weeks of every month

7   work?"

8   Q.    Okay.  What are you talking about here?

9   A.    The kids flying out to Oklahoma and staying with him.

10  Q.    And then what was his response to that?

11  A.    "I wouldn't be able to afford that."

12  Q.    And what was your response?

13  A.    "Well, what's another solution?"

14  Q.    And what did the defendant say to that?

15  A.    He said, "How about three weeks every other month?"

16  Q.    Okay.  And in line 38 what did he say?

17  A.    "So it be five weeks there, three weeks here."

18  Q.    And what was your response to that?

19  A.    "What about when she starts school?"

20  Q.    And what did he say to that in line 40?

21  A.    "I don't know about that yet.  This stuff is going to

22  keep needing adjustments."

23  Q.    Meaning what?

24  A.    The amount of time that they would spend with him.

25  Q.    So this is something you were discussing?

1    A.    Yes, ma'am.

2    Q.    Okay.  So in line 43, I believe, what was your response?

3    A.    "Yeah.  So when were you wanting to start?  And who

4    would be watching them while you work?"

5    Q.    And what did he say to that?

6    A.    "Mid-February or beginning of March.  If someone in my

7    family or Samantha can't, then there are plenty of child care

8    places around here."

9    Q.    So if this happened -- let's look at the date.  Would it

10   be fair to say January --

11   A.    January 5th.

12   Q.    2013?

13   A.    Yes, ma'am.

14   Q.    Okay.  That was right after you returned from Oklahoma?

15   A.    Yes, ma'am.

16   Q.    Okay.  Now, please --

17         MS. RIVERA MIRANDA:  Your Honor, if I may approach,

18   I believe she doesn't have this with her.  This is Government

19   Exhibit for Identification 27.

20         THE COURT:  Yes.

21   BY MS. RIVERA MIRANDA:

22   Q.    If you could take a look at that, do you recognize it?

23   A.    Yes, I do.

24   Q.    How do you recognize it?

25   A.    It's the text messages him and I exchanged back and

72

1    forth.

2    Q.    With whom?

3    A.    With Jonathan.

4    Q.    Okay.  Do you recognize his contact name in this

5    government identification?

6    A.    Yes.  It's Jon Adleta.

7           MS. RIVERA MIRANDA:  Your Honor, we're moving this

8    government identification into evidence as Government Exhibit

9    27.

10          THE COURT:  Mr. Bark.

11          MR. BARK:  No objection, Your Honor.

12          THE COURT:  27 will be received.

13          MS. RIVERA MIRANDA:  May we retrieve the document,

14   Your Honor?

15          THE COURT:  Yes, you may.

16   BY MS. RIVERA MIRANDA:

17   Q.    There's an incoming message, the first line, 399.  What

18   does it say?

19   A.    It says, "You ever figure out me having kids?"

20   Q.    And what was your response?

21   A.    "I still haven't gotten the child support."

22   Q.    What about line 401, what do you say?

23   A.    "Yes.  Between me and you, yes, I did figure it out

24   somewhat.  When will you trying to see them again?"

25   Q.    Is that a question?

1   A.   Yes.

2   Q.   Okay.  "When were you trying to see them again?"

3   A.   Yes.

4   Q.   And then what else do you say on line 402?

5   A.   "I think first time should only be two weeks, since they

6   have never been away from me.  As for now, she needs her

7   speech a whole lot during the next few months."

8   Q.   Okay.  So you were in agreement that the kids were going

9   to go back at some point?

10   A.   Yes, ma'am.

11   Q.   Okay.  Then in line 403, what did he say?

12   A.   End of February, beginning of March.

13   Q.   Is that when he wanted the kids back?

14   A.   Yes, ma'am.

15   Q.   Okay.  And what was your response to that?

16   A.   "What about her birthday?  I wanted to do something

17   special for her."

18   Q.   And what did he say to that in line 405?

19   A.   "I was thinking I could drop her off right before her

20   birthday or pick her up right after."

21   Q.   What else did he say on line 406?

22   A.   "That way I had her close to her birthday."

23   Q.   And what was your response in line 407?

24   A.   I said, "Okay."

25   Q.   Meaning okay with what?

74

1   A.   Meaning I was in agreement.

2   Q.   With what?

3   A.   With letting her travel to Oklahoma with him.

4   Q.   Right before her birthday?

5   A.   Yes, ma'am.

6   Q.   Okay.  And what did he say to that in line 408?

7   A.   "So let me know when you want."

8   Q.   And what was your response?

9   A.   "Okay.  Sounds good."

10  Q.   And what else did you say on line 410?

11  A.   "Are you fine with two weeks?"

12  Q.   Why are you asking that question?

13  A.   I was just re -- sorry.  I was just trying to verify

14  with him.

15  Q.   Okay.  And what did he say after that in line 411?

16  A.   "I was trying to think travels.  Maybe you could fly up

17  with them, then leave next day.  Then I do that on way back."

18  Q.   What is he referring to here in 411?

19  A.   He was referring to me flying out with our kids and then

20  dropping them off, and then he would actually bring them back

21  to me.

22  Q.   You would fly to Oklahoma and then he would bring them

23  back?

24  A.   Yes, ma'am.

25  Q.   Okay.  And then in line 412, what did he say?

1   A.   "For this first time, yes; but after, I want at least

2   three."

3   Q.   What is he referring to with that?

4   A.   He's saying he's fine for the first time with the kids

5   being there for two weeks, but then after that, he would want

6   them for at least three weeks at a time.

7   Q.   Okay.  Now, please take a look at Government Exhibit 3

8   for identification.

9            MR. BARK:   I'm sorry.  What number?

10  A.   Did you say 3?

11  Q.   Three.  Do you recognize it?

12  A.   Yes, I do.

13  Q.   How do you recognize it?

14  A.   It's text messages exchanged between Jonathan and I.

15  Q.   Okay.  And do you recognize his contact name in this

16  Government Exhibit for identification?

17  A.   Yes, it's Jon Adleta.

18  Q.   Okay.  And his phone number?

19  A.   XXX-XXX-6155.

20           MS. RIVERA MIRANDA:   Your Honor, at this point we

21  offer Government Exhibit 3 for identification, that it be

22  admitted into evidence as Government Exhibit 3.

23           THE COURT:   Mr. Bark?

24           MR. BARK:   No objection.

25           THE COURT:   All right.  3 will be received.

76

```
1              MS. RIVERA MIRANDA:  May we publish it, Your Honor?

2              THE COURT:  Yes.

3              MS. RIVERA MIRANDA:  That would be Bates stamp 208.

4    BY MS. RIVERA MIRANDA:

5    Q.   The first line, where it says, "Really?" that would be

6    line 1027, do you see that?

7    A.   Yes, ma'am.

8    Q.   Who says that?  It's from the context of the

9    conversation?

10   A.   It sounds like that Jon asked me that question.

11   Q.   Okay.  And what was your response to that?

12   A.   "Yeah, and J. just waved."

13   Q.   Okay.  And line 1029, what was his response to that?

14   A.   "Ha, ha, ha.  He's funny."

15   Q.   Okay.  And what did you say after that?

16              THE COURT:  Ms. Miranda, pick and choose the

17   portions that you want to discuss, but we don't need to read

18   each and every exchange unless you think there's some

19   particular relevance to it.

20              MS. RIVERA MIRANDA:  Yes, Your Honor.

21              THE COURT:  I don't want to short-circuit you, but

22   I also don't want to spend time doing things that are not --

23              MS. RIVERA MIRANDA:  Yes, Your Honor, and these

24   ones that we are going to read are relevant.

25   BY MS. RIVERA MIRANDA:
```

1   Q.   Line 1030, there's a line that indicates, "I think he is

2   going to be popular in school by how he already acts.  He's

3   quite a character."  Who are you referring to?

4   A.   My son.

5   Q.   Okay.  And then in line 1034, there's some -- there's a

6   message from defendant, "Ha, I could see him losing his

7   cherry very young."  What is the defendant referring to when

8   he says, "his cherry"?

9   A.   He's referring to virginity being taken, or whatever, at

10   a young age.

11   Q.   Okay.  And he's talking about whom?

12   A.   I'm sorry?

13   Q.   He's referring to whom?

14   A.   My son.

15   Q.   Okay.  And how old was he at the time?

16   A.   He would have been two.

17   Q.   Okay.  And what was your statement in line 1037?

18   A.   "That's so true.  I bet he will have sex by 14."

19   Q.   Okay.  And what was his response to that in line 1038?

20   A.   "Earlier."

21   Q.   Going to Bates stamp 209, line 1045, you said, "Will he

22   lose virginity, and what about K.?"  What are you saying

23   here?

24   A.   He's also talking about when my daughter would lose her

25   virginity as well.

78

1   Q.   Okay.   And what did he say to that in line 1046?

2   A.   "Maybe twelve.   Ha, ha.   Don't know about her.   Ha.

3   When is she gonna sit on me" with a --

4   Q.   What was the defendant referring to when he said, "When

5   she gonna sit on me"?

6   A.   Meaning her sitting on top of his lap, on his penis.

7   Q.   Do you mean vaginal intercourse?   What do you understand

8   by that --

9           MR. BARK:   I'm going to object.

10  BY MS. RIVERA MIRANDA:

11  Q.   -- "sit on me"?

12          THE COURT:   Hang on a minute.

13          MR. BARK:   I object as to speculation as to what

14  these terms mean that someone else wrote.

15          THE COURT:   Your response?

16          MS. RIVERA MIRANDA:   Well, Your Honor, she was part

17  of this conversation.   She knows what they were talking

18  about.

19          THE COURT:   It's overruled on the grounds of

20  speculation.

21          Do you remember the question, ma'am?

22          THE WITNESS:   Yes, ma'am -- I mean, yes, sir.

23          THE COURT:   Okay.   You can answer it.

24  A.   He's referring to her being on top of his penis.

25  Q.   And this conversation was on January 24, 2013, and your

1   response to that in line 1047 was what?

2   A.    "Ha.  Well, if she's anything like how I am about sex, I

3   think it'll be earlier than normal.  Ha.  Whenever you see

4   them again."

5   Q.    And his response to that in line 1048 was?

6   A.    "I meant when is she gonna to stick mine in her when I

7   said 'sit'?  You like seeing me come on her?"

8   Q.    Okay.  What did he mean by "come on her," if you know?

9   A.    He was referring to him ejaculating on her, like at

10  Christmastime.

11  Q.    Okay.  And in line 1050 he says, "Yeah, I want her to

12  have lots of pictures taken."  Lots of pictures of what, if

13  you know the context?

14  A.    The context was sexual pictures of her.  In other words,

15  her nude, pose nude and so forth.

16  Q.    Okay.  Now, in line 1057 it says, "I'm sure you'd like

17  to see money shots of her."  Who said that?

18  A.    Jonathan.

19  Q.    Okay.  And in line 1059, what is that?

20  A.    It's a smily face or a wink.

21  Q.    Okay.  And what was his response to that in line 1060?

22  A.    It's a symbol for, like, the tongue hanging out.

23  Q.    A tongue hanging out?

24  A.    Like, happy.

25  Q.    Okay.  And then in line 1061, there's a question there,

1  "Money shots?" that you ask.  Why did you ask that question?

2  A.   Because I was trying to verify what he was talking

3  about.

4  Q.   Okay.  Now, going to Bates stamp 210 of Exhibit 3, what

5  was his response to that, as to your question --

6  A.   "Come."

7  Q.   -- in line 1062?  "Come"?

8  A.   "Come."

9  Q.   Okay.  Meaning what?

10  A.   Ejaculation.

11  Q.   Okay.  Ejaculation on whom?  Money shots of whom, if you

12  know the context?

13  A.   My daughter.

14  Q.   Okay.  And your response to that in line 1063 was?

15  A.   "Ha, ha.  Yes."

16  Q.   And to that in line 1064 he said, "There (sic) hot

17  seeing.  I wish saw more," meaning what?  More of what?

18  A.   Of little girls with "facials" or come on them.

19        MR. BARK:  I'm going to object as to the best

20  evidence, Your Honor.  The writing speaks for itself.

21        THE COURT:  The objection is overruled.

22        We're going to take our lunch break here, Ms.

23  Miranda.

24        It's 12:30, ladies and gentlemen.  So we'll take a

25  break.  As I mentioned, we'll take an hour and 15 minutes

1  because we're kind of across the street from the restaurant

2  facilities.  It usually takes a little longer for you all to

3  get there and get something to eat and come back; but if you

4  would do your best to be back in the jury room ready to get

5  right back in your chair at 1:45, then we'll pick up with

6  this examination.  Just remember, we can't start until

7  everybody is back.

8             We'll be in recess until 1:45.

9             (Jury not present at 12:30 p.m.)

10            THE COURT:  We'll stand adjourned until 1:45.

11            (Lunch recess taken from 12:30 until 1:45 p.m.)

12            (Jury not present.)

13            THE COURT:  Are you ready to proceed, Ms. Miranda?

14            MS. RIVERA MIRANDA:  Yes, Your Honor.

15            THE COURT:  All right.  Bring our jury back,

16  please, Mr. Fiorenza.

17            (Jury present at 1:46 p.m.)

18            THE COURT:  Welcome back, ladies and gentlemen.

19  Were all of you able to abide by my instructions not to begin

20  discussing the case amongst yourselves or with anyone else?

21            (Affirmative responses.)

22            THE COURT:  All right.  Ms. Miranda, you may

23  inquire.

24            MS. RIVERA MIRANDA:  Good afternoon, ladies and

25  gentlemen and to the Honorable Court and everyone present.

```
 1   BY MS. RIVERA MIRANDA:

 2   Q.   Ms. Adleta, can you please take a look at, for

 3   identification, Number 4.

 4           MS. RIVERA MIRANDA:   That would be Bates stamp 173.

 5   BY MS. RIVERA MIRANDA:

 6   Q.   Do you recognize it?

 7   A.   Yes, ma'am.

 8   Q.   How do you recognize it?

 9   A.   It's text messages exchanged between Jonathan and I.

10   Q.   Okay.  Do you see his contact name there?

11   A.   Yes, ma'am.

12   Q.   And his phone number?

13   A.   Yes, ma'am.

14           MS. RIVERA MIRANDA:   Your Honor, at this point we

15   offer Government Exhibit for Identification Number 4 that

16   would be admitted into evidence.

17           MR. BARK:   No objection, Your Honor.

18           THE COURT:   All right.   4 will be received.

19           MS. RIVERA MIRANDA:   May we publish it, Your Honor?

20           THE COURT:   Yes, you may.

21           MS. RIVERA MIRANDA:   Okay.

22   BY MS. RIVERA MIRANDA:

23   Q.   Okay.  Ms. Adleta, going to the top portion, this

24   incoming message indicating, "So you want -- what you want to

25   see K. play?" what do you mean by "play"?  I'm sorry.  What
```

```
 1    did he mean by "play"?

 2    A.    What did he mean?

 3    Q.    Uh-huh.  What did the defendant mean by "play"?  If you

 4    need a moment to review the text messages, take your time.

 5    A.    Okay.

 6            He's referring to --

 7            MR. BARK:  Your Honor, I'm sorry.  I have an

 8    objection, for lack of predicate as to how she would know

 9    this.

10            THE COURT:  The objection is sustained.  You can

11    lay a predicate and you can ask the question again.

12    BY MS. RIVERA MIRANDA:

13    Q.    Okay.  You indicated that this was part of a

14    communication that you had with the defendant?

15    A.    Yes, ma'am.

16    Q.    Okay.  And when did that take place?

17    A.    February 12th of 2013.

18    Q.    Okay.  And what were you discussing with the defendant

19    at this time?

20    A.    Our children and specifically my daughter.

21    Q.    As to what topic specifically?

22    A.    Sexual activities.

23    Q.    Okay.  Now, when you -- when you received this message,

24    defendant stated, "So what you want to see K. play," what do

25    you understand by that?  What did he mean by that?  What was
```

84

1   your understanding?

2   A.    He wanted to -- he was referring to her being played

3   with sexually.

4   Q.    Okay.  And what about on 1947, when you say, "Your cock

5   and my pussy, ha, ha," what are you referring to?

6   A.    His -- his penis and -- and my pussy.

7   Q.    Your vagina?

8   A.    Yes, ma'am.

9   Q.    Okay.  And his response to that in line 1948, "Oh, so

10  you want her to make my cock play with your pussy," what did

11  you understand he meant by that?  What did he mean by that?

12  A.    He was referring to my daughter playing with Jonathan's

13  penis and then as well as my vagina area.

14  Q.    And in line 1950, when he states -- when he states, "Ha,

15  her playing with anything is hot," what did you understand he

16  meant by that?

17  A.    I understood it as my daughter playing with a penis or

18  any kind of sexual thing.

19  Q.    Okay.  In line 1953 you ask, "Have you heard of sounding

20  rods?"  Why did you ask that question?

21  A.    Because Aaron Dixon had wanted me to buy these for her.

22  Q.    Okay.  And in line 1955, when he says, "Her with come

23  anywhere on her would be so, so hot," what is he referring

24  to?

25  A.    My daughter having ejaculation on her body.

1    Q.    Okay.  And did you try to explain to the defendant what

2    sounding rods are?  Did you see that here?

3    A.    Yes, I do.

4    Q.    Okay.  So in line 1956, what do you explain to him?

5    A.    "A metal rod stick in the pee hole (start out small,

6    then big) and supposedly it gives a great orgasm."

7    Q.    Now, after that, in line 1957, you state, "Ha, ha.  Hope

8    she will like that more than she does now."  What were you

9    referring to at that point?

10   A.    The come or ejaculation on her.

11   Q.    Why did you say that; do you remember?

12   A.    I'm sorry?

13   Q.    Why did you say that; do you remember?

14   A.    Because we had discussed it.

15   Q.    You have discussed what?

16   A.    What took place at the trip.

17   Q.    Which trip?

18   A.    The Christmas trip.

19   Q.    December 2012?

20   A.    Yes, ma'am.

21   Q.    Okay.  And his response in 1959, "More than she does

22   now?  You having someone come on her?" what did you

23   understand he mean by that?

24   A.    I understood it as my daughter having ejaculation on her

25   from someone else.

1    Q.   He was asking you that question, if you were having

2    someone else ejaculate on her.   Okay.   And what was your

3    response in line 1961?

4    A.   "No.   I was referring to her with you the last time.

5    Remember, she freaked out."

6    Q.   What were you talking about then?

7    A.   I was referring to the incident that took place at his

8    house when he came on her, ejaculated on her.

9    Q.   Okay.   And in line 1962, Bates stamp 174, line 1962, it

10   says, "She kinda did.   Maybe you should get someone to come

11   on her."   What did you understand that to mean?

12   A.   I understood it to be that, yeah, she did freak out and

13   that he wanted me to get someone to come on her, ejaculate on

14   her.

15   Q.   And let me ask you, did the defendant actually suggest

16   who should come on her?

17   A.   Yes.

18   Q.   And who did he mention?

19   A.   A guy named Matt that I was dating, as well as my dad.

20   Q.   You said he mentioned your dad.   Now, if we go to Bates

21   stamp 175, line 1983, it says, "Ha.   Well, there is always

22   your dad.   Ha, ha.   I'm sure he hasn't had any in a while and

23   love the release."   Is that what you're referring to when he

24   suggested your dad?

25   A.   Yes, ma'am.

1   Q.   Okay.   Now, going back to Bates stamp 174, the same

2   exhibit, in line 1963 you ask, "What your thoughts of her

3   playing with a small dildo now?"   Why did you ask that

4   question and what is a dildo?

5   A.   I asked him because I was asking his permission, and

6   Aaron had wanted to -- me to buy a sex object for her, such

7   as a dildo, which is an object that's placed in the vagina

8   area.

9   Q.   A sex toy?

10   A.   Yes, ma'am.

11   Q.   So you were consulting the defendant about buying a sex

12   toy for your daughter?

13   A.   Yes.

14   Q.   Okay.   And when you mention Dixon in this, you said

15   Dixon was asking you to do this?

16   A.   Yes, he was.

17   Q.   Okay.   So you were doing these things for both the

18   defendant and Dixon?

19   A.   Yes.

20   Q.   Okay.   Now, his response in line 1965 was, "That's fine.

21   Ha.   Just take pictures."   "Pics," does that mean pictures?

22   A.   Yes, ma'am.

23   Q.   Okay.   And what is that symbol next to it?

24   A.   It's a symbol that's like a tongue sticking out.

25   Q.   Now, going to Bates stamp 175, line 1988, defendant

1   states, "Ha, ha.  Okay.  But the bigger thing is seeing her

2   do anything, which is really hot.  Ha.  I'm sure you could

3   find someone easy, though, if really wanted."  What did you

4   understand he mean by that?

5   A.   I understood it as seeing my daughter do anything

6   sexually would be really hot to him and that he wanted me to

7   find someone to engage in sexual activity with her.

8   Q.   And what was your response to that in line 1989?

9   A.   "You just need to get your ass here.  Laugh out loud."

10  Q.   Okay.  And then on line 1992 the defendant states,

11  "Besides, don't you want to see her explore with other

12  people?  Besides, I'm sure other people have way more come

13  than me."  What did you understand by that?

14  A.   I understood it to mean that he -- he wanted me to see

15  other guys perform sexual acts on her and he was saying that

16  there would be more ejaculation from other men than him.

17  Q.   Okay.  And going to Bates stamp 176, in line 2001, so --

18  there's a message from you:  "So why didn't you do much with

19  her when she was there?"  What are you referring to here?

20  A.   I'm referring to the incident that happened at

21  Christmastime at his house.

22  Q.   Why are you asking this question?

23  A.   Because Aaron had wanted me to get some videos and

24  pictures of her.

25  Q.   And his response in line 2002 is, "I don't know"?

1    A.    Correct.

2    Q.    Okay.  Then in line 2004 you state, "Because you

3    obviously are into it, and just wondered what held you back."

4    Why do you say this?

5    A.    I said it because we had discussed these things before

6    the trip and he just did, obviously, the one incident that I

7    told you about with her, and I was just asking him why he

8    hadn't done more with her.

9    Q.    You were expecting other things to happen?

10    A.    Yes.

11    Q.    Now, let me ask you to go to Exhibit for Identification

12    10 and 11.  Please take a look at Government Exhibit for

13    Identification Number 10.  Do you recognize it?

14    A.    Yes, I do.

15    Q.    How do you recognize it?

16    A.    It is a picture taken at the vacation on the Christmas

17    trip at his house.

18    Q.    Okay.  Do you recognize the persons depicted in this

19    picture?

20    A.    Yes, I do.

21    Q.    Who are they?

22    A.    It is Samantha Bryant's children as well as our children

23    and Jonathan and myself.

24         MS. RIVERA MIRANDA:  Your Honor, I would now offer

25    Government Exhibit 10 for identification into evidence.

```
 1              MR. BARK:  No objection.

 2              THE COURT:  It'll be received.

 3              MS. RIVERA MIRANDA:  May we publish it, Your Honor?

 4              THE COURT:  Yes, you may.

 5   BY MS. RIVERA MIRANDA:

 6   Q.    Now, please tell the members of the jury who is depicted

 7   here; and if you can actually identify them, please mark to

 8   identify each one of the persons in this picture.

 9   A.    I guess that's how I'm doing it.  Am I doing it

10   correctly?

11   Q.    That's fine.

12   A.    That's Samantha's son.  His name is L.  And then the

13   girl is M., which is Samantha Bryant's daughter.  And that's

14   Jonathan Adleta.  That's K. Adleta, J. Adleta, and myself.

15   Q.    Now, going to Exhibit 11 for identification, do you

16   recognize it?

17   A.    Yes, I do.

18   Q.    How do you recognize it?

19   A.    It was taken one after the other, the picture was.  It's

20   at his house.

21   Q.    Okay.  Do you recognize the persons that are depicted

22   here?

23   A.    Yes, I do.

24   Q.    Who are they?

25   A.    It's Samantha's children as well as our children and
```

```
 1    Jonathan and his girlfriend, Samantha Bryant.

 2              MS. RIVERA MIRANDA:  Your Honor, I request that

 3    Government Exhibit 11 for identification be admitted into

 4    evidence.

 5              MR. BARK:  No objection.

 6              THE COURT:  It'll be received.

 7              MS. RIVERA MIRANDA:  May we publish it, Your Honor?

 8              THE COURT:  Yes, you may.

 9              MS. RIVERA MIRANDA:  That's Bates stamp 197.  Okay.

10    If we can, clear this.

11              Okay.  Thank you.

12    BY MS. RIVERA MIRANDA:

13    Q.   Now, can you please identify for the jury who are the

14    persons depicted here?

15    A.   It's L., Samantha Bryant's son.  M., Samantha's

16    daughter.  Jonathan Adleta, K. Adleta, J. Adleta, and

17    Samantha Bryant.

18    Q.   Who took this picture?

19    A.   I did.

20    Q.   And when was this picture taken?

21    A.   When I was there at his house in Oklahoma.

22    Q.   In December 2012?

23    A.   Yes, ma'am.

24    Q.   Okay.  What about the previous picture, the Exhibit

25    Number 10?
```

92

1    A.    Yes, that was taken in the same time frame.

2    Q.    Who took that picture?

3    A.    Samantha Bryant.

4    Q.    And when was this?

5    A.    This was while I was there at his house that week.

6    Q.    Of December 2012?

7    A.    Yes, ma'am.

8    Q.    Okay.  I'm going to ask you to look at Government

9    Exhibit for Identification Number 5.  Do you recognize it?

10   A.    Yes, I do.

11   Q.    How do you recognize it?

12   A.    It's the conversation Jonathan and I had through Skype.

13   Q.    With whom?

14   A.    It's a conversation I had with Jonathan with Skype.

15   Q.    Okay.  Do you recognize his user name in this document?

16   A.    Yes, ma'am.

17   Q.    And what about yours?  Do you recognize yours in this

18   document?

19   A.    Yes, I do.

20   Q.    Okay.  And when did this communication take place?

21   A.    February 13th of 2013.

22          MS. RIVERA MIRANDA:  Your Honor, we now move that

23   Government Exhibit for Identification Number 5 be admitted

24   into evidence.

25          THE COURT:  Mr. Bark?

```
 1              MR. BARK:  No objection, Your Honor.

 2              THE COURT:  It'll be received, Number 5, for the

 3   government.

 4              MS. RIVERA MIRANDA:  May we publish it, Your Honor?

 5              THE COURT:  Yes, you may.

 6              MS. RIVERA MIRANDA:  The top half.

 7   BY MS. RIVERA MIRANDA:

 8   Q.   Now, in line 701 you ask, "So I guess things are pretty

 9   serious with Samantha."  Who is Samantha?

10   A.   Jonathan Adleta's girlfriend.

11   Q.   The one that you identified in the picture in

12   Exhibit 11, I believe?

13   A.   Yes, ma'am.

14   Q.   Now, his response in 702 is, "Yeah"?

15   A.   Correct.

16   Q.   Going to line 708, what did he say?

17   A.   He said, "I'm still into young and dad-daughter stuff.

18   So. . .I don't know."

19   Q.   What did you understand that to mean?

20   A.   I understood that to mean that father and daughters

21   would engage in sexual activity.

22   Q.   That he was still into that?

23   A.   Yes, ma'am.

24   Q.   Okay.  In line 710 what did you ask?

25   A.   Did you say 710?
```

1    Q.    Yes.

2    A.    "But she doesn't know that, does she?"

3    Q.    What are you referring to?

4    A.    I'm referring to Samantha knowing about him looking at

5    child pornography.

6    Q.    And his response in line 712 was, "She knows"?

7    A.    Yes.

8    Q.    Okay.  Now, going to Bates stamp 212, in line 730 you

9    say, "Should be living somewhere where it is socially

10   acceptable."  What do you mean by that?

11   A.    I was referring to when Aaron Dixon had told me there

12   was different countries, such as, like, Russia, that -- where

13   it's acceptable for -- for girls to engage -- young girls to

14   engage in sexual activity.

15   Q.    So the defendant knew about Aaron Dixon?

16   A.    Yes.

17   Q.    Now, in line 741 defendant states, "He doing stuff?"

18   What do you understand that to mean?

19   A.    I understood it to mean that was he engaging in sexual

20   activity with his daughter.

21   Q.    Who?

22   A.    Aaron Dixon.

23   Q.    The defendant is asking you whether you know if Aaron

24   Dixon is molesting his daughter?

25   A.    Yes.

1   Q.    And what was your response to that in line 742?

2   A.    "Yes."

3   Q.    Okay.  Now, going to Bates stamp 213, in line 749, you

4   state, "He gives oral."  What do you mean by that and who are

5   you talking about?

6   A.    I'm referring to Aaron Dixon and I'm talking about him

7   licking his daughter's vaginal area.

8   Q.    Are you talking about Dixon giving oral sex to his

9   daughter?

10  A.    Yes.

11  Q.    And in line 750 you state, "And she likes rubbing

12  against him."  What are you referring to there?

13  A.    I'm referring to his daughter rubbing against his penis.

14  Q.    In line 751 the defendant asks, "She give oral?"  What

15  did you understand that to mean?

16          MR. BARK:  I'm sorry.  We'll ask to rephrase the

17  last statement to clarify who the he's are.

18          MS. RIVERA MIRANDA:  Okay.

19          THE COURT:  Why don't you restate the question, Ms.

20  Miranda, so that it's clear.

21          MS. RIVERA MIRANDA:  Yes.

22  BY MS. RIVERA MIRANDA:

23  Q.    As to line 750, "And she likes rubbing against him," who

24  are you referring to here?

25  A.    Aaron Dixon.

1   Q.   And his daughter?

2   A.   Yes, ma'am.

3   Q.   Okay.  Now, in line 751 defendant states, "She give

4   oral?"  What did you understand that to mean?

5   A.   I understood it to mean was his daughter giving head

6   to -- to Aaron.

7   Q.   And in line 753 he says, "He come?"  What does that

8   mean?  What did you understand that to mean?

9   A.   It meant that, did he ejaculate?

10  Q.   Who?

11  A.   Aaron Dixon.

12  Q.   On his daughter?

13  A.   Yes.

14  Q.   And your response in line 754 was what?

15  A.   "Don't know that."

16  Q.   Okay.  Now, going to Bates stamp 215, line 799, it

17  states, "Was gonna try something with the boy on cam, but

18  mama came out," and that's defendant.  What do you understand

19  that to mean?

20  A.   I understood it to mean that he was going to engage in

21  sexual activity with Samantha's son.

22  Q.   Who was going to engage --

23  A.   Jonathan.

24  Q.   -- in sexual activity?

25  A.   Jonathan Adleta.

1    Q.    And in line 803 you state, "Gonna try something with

2    boy?"  Why are you asking this?

3    A.    I was just asking him if he had done anything with him.

4    Q.    Okay.  And his response in line 804 is, "Have him suck

5    me.  Would you like that?"  What did you understand that to

6    mean?

7    A.    That Samantha's son, L., would suck on Jonathan's penis

8    and would I want to see that.

9    Q.    Okay.  And your response was in line 805, "Humm," and

10   you also said, "It is not necessarily hot to me that much,

11   but it is interesting to watch."  What are you referring to

12   there?

13   A.    I'm referring to it's -- it -- I'm saying it's

14   interesting to watch the boy giving head to Jonathan, but I

15   was saying as well that it wasn't that hot to me.

16   Q.    And by "giving head," you mean what?

17   A.    Him giving oral to Jonathan.

18   Q.    Okay.  Now, going to Exhibit 6 for identification,

19   please review it.  Do you recognize it?

20   A.    Yes, I do.

21   Q.    How do you recognize it?

22   A.    It's a conversation I had with Jonathan through Skype.

23   Q.    Okay.  Do you recognize his user name?

24   A.    Yes, I do.

25   Q.    What about your user name?

1   A.   Yes, I do.

2   Q.   Okay.  And when did this take place?

3   A.   March 5th of 2013.

4        MS. RIVERA MIRANDA:  Now, Your Honor, we're

5   offering that Government Exhibit 6 for identification be

6   admitted into evidence.

7        MR. BARK:  No objection.

8        THE COURT:  6 will be received.

9   BY MS. RIVERA MIRANDA:

10  Q.   Okay.  Going to Bates stamp 177 --

11       MS. RIVERA MIRANDA:  The top half.

12  BY MS. RIVERA MIRANDA:

13  Q.   -- in line 937 you state -- or he states -- I'm sorry --

14  "Yeah, I haven't really seen anything."  What do you

15  understand that to mean?

16  A.   I understood it to mean pictures of young girls.

17  Q.   Okay.  And in line 938 -- let me go back.  Pictures of

18  young girls doing what?

19  A.   Playing with themselves or just being naked.

20  Q.   How do you know that?

21  A.   Because these were the conversations I had with him and

22  he had told me he had liked looking at the pictures, and

23  there were times where he would share pictures with me and

24  then I would --

25  Q.   Pictures of what?

99

1    A.    Of young girls in sexual activity, and I would send them

2    to Aaron Dixon.

3    Q.    Okay.  So, after that, he says in line 938, "I wish I

4    could see stuff, though."  And "stuff," what did he mean by

5    that?

6    A.    Looking at --

7    Q.    What did you understand that to mean?

8    A.    I understood it to be that he wishes he could see young

9    girls in sexual activity.

10   Q.    And in line 939 your response was, "I think I still have

11   the link."  What are you referring to?

12   A.    I'm referring to a link on a website that Aaron had

13   given me.

14   Q.    And in line 943 you state, "She still wants me to do

15   stuff with her."  What are you talking about here?

16   A.    I'm referring to sexual activity with my daughter.

17   Q.    With K.?

18   A.    Uh-huh.

19   Q.    And his response in line 946 was, "That's cool"?

20   A.    Correct.

21   Q.    Okay.  Now, in line 947 he's asking, "Do you have it on

22   the computer?"  What is he referring to here, if you know?

23   A.    He's referring to -- I believe he's referring to

24   pictures of young girls.

25   Q.    Did you actually send him a link?

1    A.    Yes, I did.

2    Q.    To child pornography?

3    A.    Yes, I did.

4    Q.    In line 907, and that's Bates stamp 178, you state, "I'm

5    sure I could get more like that from him."  What are you

6    talking about here?

7    A.    More pictures and more videos of young girls in sexual

8    activity.

9    Q.    Okay.  And his response in line 971 is, "Really?"  And

10   your response in line 972 was, "Yeah."

11         Now, going to Bates stamp 179, line 990, you

12   state, "He wants me to do stuff with K."  What are you

13   referring to?  Who are you referring to?

14   A.    Aaron Dixon, and he wanted me to engage in sexual

15   activity with my daughter.

16   Q.    And defendant states in line 992, "On Skype for him?"

17   Your response in line 93 is, "Yes"?

18   A.    Correct.

19   Q.    And in line 996 he asks you, "What have you done?"  What

20   do you understand that to mean?

21   A.    I understood it to be what have I done with my daughter

22   sexually.

23   Q.    And what was your response to that in line 997?

24   A.    "Just given her oral."

25   Q.    And in line 999 what do you say?

1    A.    "She practically begs for it."

2    Q.    What are you referring to in those two lines?  When you

3    say you have given her oral and that she practically begs for

4    it, what are you talking about?

5    A.    I'm referring to my daughter wanting me to give her oral

6    sex or licking her vagina area.

7    Q.    Did you do this while Dixon watched on Skype?

8    A.    Yes.  That's the only time I did it.

9    Q.    I'm sorry.  What did you say?

10   A.    That's the only time I did it, while he was watching on

11   Skype.

12   Q.    While Dixon was watching on Skype.  Okay.  And you said

13   in line 1001, "But she loves it."

14               Actually, in line 1,000 you said, "Only done it a

15   few times."  So was it one or more than one time that you did

16   this to your daughter?

17   A.    More than once.

18   Q.    Now, his response in line 1002 is, "Bet he loves it,

19   too."  What did you understand that to mean?

20   A.    I understood it to be that Aaron Dixon likes watching or

21   loves watching me do stuff to my daughter sexually.

22   Q.    And then in line 1004 defendant states, "So the question

23   is:  When are you going to have her suck on a cock?"  Can you

24   please explain to the members of the jury what the defendant

25   mean by that, if you understood?

1    A.    I understood it to be as if my daughter -- when I was

2    going to have someone watch her suck on someone's penis.

3    Q.    And your response to that was what in line 1005?

4    A.    "I don't do anything unless she wants it."

5    Q.    And then you also stated in line 1006, "Humm.  Well,

6    when it's right guy," and in 1007, "and right time."  What

7    did you mean by that?

8    A.    Meaning that I only allow my daughter -- I was only

9    going to allow them to -- Aaron Dixon as well as Jonathan

10   Adleta to perform in sexual activity with my daughter.

11   Q.    Those are the only people that you would consider?

12   A.    Uh-huh.

13   Q.    And in line 1009 in Bates stamp 180 you state, "He is

14   only one I consider besides you."  What did you mean by that?

15   A.    I meant that Aaron Dixon and Jonathan Adleta would be

16   the only ones in performing sexual activity with her.

17   Q.    And what was his response to that in line 1010?

18   A.    "I'd like to see that."

19   Q.    What did you understand that to mean?

20   A.    I understood it to be that he would like to see him,

21   referring to Aaron, see my daughter engaging in sexual

22   activity with him.

23   Q.    And, more specifically, oral sex?

24   A.    Yes, ma'am.

25   Q.    In line 1018, defendant states, "Well, if you do, you

 1    got to record it."  If you do what?

 2    A.    If my daughter was going to engage in sexual activity

 3    with Aaron Dixon, he wanted me to video it.

 4    Q.    And then in line 1020, you state, "Are you hoping to see

 5    the kids by summer?"  And by that, which year are you

 6    referring to?

 7    A.    This year, 2013.

 8    Q.    Okay.  And what was his response to that?

 9    A.    Yes.

10    Q.    Okay.  Now I'm going to ask you to look at Exhibit 12

11    for identification.  Do you recognize it?

12    A.    I do.

13    Q.    How do you recognize it?

14    A.    It's my son on top of me.

15    Q.    Can you describe to the members of the jury what is he

16    doing?

17    A.    He's inserting a dildo into my vagina.

18    Q.    Okay.  Who took this picture?

19    A.    I did.

20    Q.    For what purpose?

21    A.    For Aaron Dixon.

22    Q.    Okay.

23          MS. RIVERA MIRANDA:  Now, Your Honor, we are

24    offering Government Exhibit 12 for identification, that it be

25    admitted into evidence as Government Exhibit 12.

1          THE COURT:  Mr. Bark.

2          MR. BARK:  I'm going to object as to relevance at

3    this point.

4          THE COURT:  Sustained.

5    BY MS. RIVERA MIRANDA:

6    Q.    Let me ask you, did you share information with defendant

7    regarding this incident, what you did with your son?

8    A.    Yes, I did.

9    Q.    Now, what was his response to that?

10   A.    He -- he liked the idea of it; and from my

11   understanding, he wanted a picture of it.

12   Q.    Okay.

13         MS. RIVERA MIRANDA:  Now, Your Honor, we resubmit,

14   based on her answers.

15         THE COURT:  Mr. Bark.

16         MR. BARK:  No objection.

17         THE COURT:  It'll be received.

18         MS. RIVERA MIRANDA:  May we publish it, Your Honor?

19         THE COURT:  Yes, you may.

20         MS. RIVERA MIRANDA:  That's Bates stamp 201.

21   BY MS. RIVERA MIRANDA:

22   Q.    Now, can you please tell the members of the jury who is

23   that child that's in between your legs?

24   A.    That is my son.

25   Q.    Okay.  And what is he doing as depicted in this

1   photograph?

2          MR. BARK:  Your Honor, I'm sorry.  Can I have a

3   moment?  I'm not sure what's being shown where.

4          THE COURT:  Nothing is up right now.  The picture

5   went up and came right down.  I think that was by design.

6          MR. BARK:  Thank you.

7   A.   He is inserting a dildo into my vagina.

8   Q.   Do you mean a sex toy?

9   A.   Yes, ma'am.

10  Q.   Did you have him do that?

11  A.   Yes.

12  Q.   How old was your son when this happened?

13  A.   He was one and a half to two years of age.

14  Q.   Now, I'm going to ask you to take a look at Government

15  Exhibit 16 for identification.

16         MR. BARK:  Your Honor, before we go into that, may

17  I approach to see the exhibit for a moment that we were just

18  referring to?

19         THE COURT:  Yes.

20         MR. BARK:  I'm sorry, but I need to approach for a

21  moment to discuss this exhibit.

22         THE COURT:  Okay.

23         (Bench conference as follows.)

24         MR. BARK:  I don't have an objection to the

25  photograph coming in as it was portrayed just to be a

1    photograph, but on top of the photograph is information that

2    was not discussed at the time it was being admitted.  So I

3    would seek to have that not admitted into evidence because

4    that's not what I was being told was admitted.  So I object

5    to the top part coming in at this point.

6              THE COURT:  Okay.  I don't know what's on the top

7    part.

8              Do you want to be heard?

9              MS. RIVERA MIRANDA:  Yes, Your Honor.  I will have

10   the expert testify exactly as to where this picture came

11   from.

12             THE COURT:  Okay.

13             Subject to it being tied up, I'm going to overrule

14   your objection.  If it's not tied up by the government in

15   terms of why this other extraneous information is relevant,

16   then I'll revisit it.

17             MR. BARK:  Thank you.

18             (In open court.)

19   BY MS. RIVERA MIRANDA:

20   Q.   Going back to Government Exhibit 12, let me ask you, do

21   you recall sending that picture to the defendant?

22   A.   Yes, I do.

23   Q.   Now, as to Government Exhibit 16, let me ask you, have

24   you seen the defendant naked?

25   A.   Yes, I have.

1    Q.    How many times?

2    A.    A lot.

3    Q.    Okay.  Now, let me ask you, do you recognize this

4    photograph?

5    A.    Yes, I do.

6    Q.    How do you recognize it?

7    A.    It is Jonathan Adleta, and I can tell because of his

8    freckles on his hand and I know what his penis looks like.

9    Q.    Okay.

10            MS. RIVERA MIRANDA:  Now, Your Honor, we're

11   offering Government Exhibit 16 for identification, that it be

12   admitted into evidence.

13            THE COURT:  Mr. Bark.

14            MR. BARK:  No objection.

15            THE COURT:  It'll be received.

16            MS. RIVERA MIRANDA:  May we publish it, Your Honor?

17            THE COURT:  Yes.

18            MS. RIVERA MIRANDA:  206.

19   BY MS. RIVERA MIRANDA:

20   Q.    Can you please describe to the members of the jury what

21   is depicted here?

22   A.    It's Jonathan's penis rubbing against a little girl.

23   Q.    Okay.  Now please turn to Government Exhibit for

24   Identification Number 17.  Do you recognize it?

25   A.    Yes, I do.

1    Q.    How do you recognize it?

2    A.    I recognize it because it's Jonathan's penis and I

3    recognize it by his freckles on his hand.

4          MS. RIVERA MIRANDA:  Your Honor, we now move that

5    Government Exhibit 17 for identification be admitted into

6    evidence.

7          THE COURT:  Mr. Bark.

8          MR. BARK:  No objection.

9          THE COURT:  It'll be received.

10         MS. RIVERA MIRANDA:  May we publish it, Your Honor?

11         THE COURT:  Yes.

12         MS. RIVERA MIRANDA:  207.

13   BY MS. RIVERA MIRANDA:

14   Q.    Can you please tell the members of the jury what is

15   depicted here?

16   A.    It's a picture of Jonathan's penis hard and it's --

17   Q.    Can you speak up?

18   A.    Sorry.  It's a picture of Jonathan's penis hard and it

19   looks like it's rubbing against that -- I can't tell if it's

20   a leg or what it is in the picture, but against a body.

21   Q.    Okay.  Now, these are Government Exhibit 16 and 17.  You

22   said -- you describe it was defendant's penis, and it appears

23   to be an erect penis; would that be correct?

24   A.    Yes, ma'am.

25         MS. RIVERA MIRANDA:  Your Honor, may I have a

1    second?

2              THE COURT:  Yes.

3              MS. RIVERA MIRANDA:  Your Honor, if we may approach

4    the witness?

5              THE COURT:  Yes.

6    BY MS. RIVERA MIRANDA:

7    Q.    Please examine Government Exhibit 1, the first page.

8    Let me ask you first whether you are familiar with

9    defendant's handwriting?

10   A.    Yes, I am.

11   Q.    How come?

12   A.    Because I saw him write several things and I've seen him

13   sign different documents.

14   Q.    Okay.  Now, do you recognize this, Government Exhibit

15   1 --

16   A.    No, I do not.

17   Q.    -- for identification?

18   A.    No, I do not.

19   Q.    And what I'm asking specifically, do you recognize the

20   handwriting --

21   A.    Yes.

22   Q.    -- in this first page of the exhibit?

23   A.    Yes.

24   Q.    Do you recognize it?

25   A.    Yes, I do.

```
1    Q.    How do you recognize it?

2    A.    It's Jonathan's --

3          MR. BARK:  Objection, Your Honor.  She's not --

4    lack of predicate.  She's not qualified to give this opinion.

5          THE COURT:  Overruled.

6    A.    I -- I recognize it because I've -- like I said, I've

7    seen him write different things, you know, such as signing a

8    check or at one point, you know, signing leasing documents

9    and that kind of thing.

10   Q.    Whose handwriting is that in Government Exhibit 1 for

11   identification?

12   A.    It is Jonathan Adleta's.

13         MS. RIVERA MIRANDA:  Your Honor, may we retrieve

14   it?

15         THE COURT:  Yes.

16         MS. RIVERA MIRANDA:  May we have a second?

17         THE COURT:  Yes.

18         MS. RIVERA MIRANDA:  Your Honor, no further

19   questions.

20         THE COURT:  Cross-examination?

21         MR. BARK:  Please, Your Honor.

22                   CROSS-EXAMINATION

23   BY MR. BARK:

24   Q.    Good afternoon.

25   A.    Good afternoon.
```

1    Q.    By name is Matthews Bark.  I'm going to ask you a couple

2    of questions, and that's a lawyer's definition of "a couple."

3    So it may be a few more than that.

4    A.    Okay.

5    Q.    But you went to Jonathan Adleta's house in Oklahoma,

6    correct?

7    A.    Yes, I did.

8    Q.    You did that at some time in late November, early

9    December?

10   A.    No.  I went the last week in December, at Christmastime.

11   Q.    Okay.  So you were there for Christmas?

12   A.    Yes, sir.

13            THE COURT:  Mr. Bark, would you pull the microphone

14   to you a little bit.

15            MR. BARK:  Yes, sir.  Sorry.

16   BY MR. BARK:

17   Q.    How long did you spend at Jonathan Adleta's house?

18   A.    Approximately 13 days.

19   Q.    So you're familiar with the layout of the house?

20   A.    Very familiar.

21   Q.    And you've mentioned an event when Samantha Bryant was

22   moaning, I believe you said?

23   A.    Yes.

24   Q.    And that was coming from the master bedroom; is that

25   correct?

1    A.    Correct.

2    Q.    Next to the master bedroom is the master bathroom; is

3    that correct?

4    A.    It's not next to it.  You walk in and there's the

5    bedroom with the windows, and then you walk a little bit and

6    there's a little path, like, to the left where the bathroom

7    was.

8    Q.    So is the bathroom essentially in the master bedroom?

9    A.    Technically speaking, no, but yes.

10   Q.    So it's connected by a wall?

11   A.    Correct.

12   Q.    To the master bedroom?

13   A.    Uh-huh.

14   Q.    And in that wall is a door; is that correct?

15   A.    Correct.

16   Q.    And when you said you heard Ms. Bryant moaning, you

17   concluded that Mr. Adleta and Ms. Bryant were having sex; is

18   that correct?

19   A.    Yes, I did.

20   Q.    But you didn't actually observe it; is that correct?

21   A.    That is correct.

22   Q.    Now, you say that there were children in the room; is

23   that correct?

24   A.    Yes.

25   Q.    But you didn't actually see the children in the master

1   bedroom; is that correct?

2   A.    That is correct.

3   Q.    Okay.  You don't know if they were actually in the

4   bathroom; is that correct?

5   A.    Correct.

6   Q.    Now, you requested in some way or another that Mr.

7   Adleta leave the bedroom; is that correct?

8   A.    Yes, I did.

9   Q.    And when he came out of the bedroom, he was actually

10  clothed; is that correct?

11  A.    That is correct.

12  Q.    Okay.  So it's true that you don't really know whether

13  Ms. Bryant and Mr. Adleta were having sex at that time; is

14  that correct?

15  A.    That is correct.

16  Q.    Now, you've mentioned your divorce from Mr. Adleta?

17  A.    Uh-huh.

18  Q.    And there was many conversations between the two of you

19  in regards to your children; is that correct?

20  A.    Yes, sir.

21  Q.    In one of those conversations, if not many of those

22  conversations, Mr. Adleta threatened to call Child Protective

23  Services; is that correct?

24  A.    He -- he did not threaten several times.

25  Q.    Did he threaten at least one time?

1          MS. RIVERA MIRANDA:  Objection, Your Honor; it's

2    outside the scope and relevance.

3          THE COURT:  It's overruled.

4    A.   What are you referring to?

5    Q.   Well, there was many times where you discussed who the

6    children should spend their time with; is that correct?

7    A.   When -- I'm not understanding your question.

8    Q.   Okay.  Let me rephrase it.  In December you had a

9    conversation with Mr. Adleta and he was concerned about your

10   children; is that correct?

11   A.   I need a moment, please.

12   Q.   Sure.

13   A.   I -- I do not remember him threatening me with the Child

14   Protective Services.

15   Q.   Okay.  But he did make you aware that he was

16   concerned --

17   A.   No.

18   Q.   -- about -- not at all?

19   A.   Never.

20   Q.   Okay.

21   A.   To my knowledge, never.

22   Q.   You did have many conversations with him, though, about

23   who the children should spend their time with; is that

24   correct?

25   A.   Yes.

1    Q.    Can you describe for me the freckles that you were

2    referring to in the picture?

3    A.    Describe it in what way?

4    Q.    Can you tell me their location?

5    A.    They're on the hand, near the wrist area.

6    Q.    How many freckles?

7    A.    I don't know how many.

8    Q.    More than five?

9    A.    I'm not sure.

10   Q.    More than ten?

11   A.    I don't believe so.  Actually, can I say something off

12   of the hand?

13   Q.    There's no question pending.

14           THE COURT:  Just wait for a question, ma'am.

15           THE WITNESS:  Okay.

16           MR. BARK:  Thank you.

17           May I have a moment?

18           THE COURT:  Yes.

19   BY MR. BARK:

20   Q.    You knew Michael Dixon before you ever met Jonathan

21   Adleta; is that correct?

22   A.    Michael Dixon?

23   Q.    Yes.

24   A.    I did not know a Michael Dixon.

25   Q.    Excuse me.  Aaron Dixon?

116

```
1   A.    Yes.

2   Q.    Thank you.

3            MR. BARK:  No further questions, Your Honor.

4            THE COURT:  Any redirect?

5            MS. RIVERA MIRANDA:  Just one question.

6                     REDIRECT EXAMINATION

7   BY MS. RIVERA MIRANDA:

8   Q.    When exactly was it you started sexually molesting your

9   children?

10  A.    Approximately March of 2012.

11           MS. RIVERA MIRANDA:  Thank you.

12           THE COURT:  You may step down.

13           Call your next witness.

14  *****

15           (Excerpt concluded.)

16                  - - - - - - - -

17                 Reporter's Certification

18  I certify that the foregoing is a correct transcript from the

19  record of proceedings in the above-entitled matter.

20                          s/Diane Peede, RMR, CRR
                            Official Court Reporter
21                          United States District Court
    Date:   December 16, 2013   Middle District of Florida
22

23

24

25
```