1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case no.:  6:13-cr-94-Orl-37GJK

UNITED STATES OF AMERICA,       )     Orlando, Florida
                                )     September 12, 2013
            Plaintiff,          )
                                )
        v.                      )
                                )
JONATHAN DANIEL ADLETA,         )
                                )
            Defendant.          )
_____ )


Transcript of an excerpt (closing arguments)

of the jury trial (day three)

before the Honorable Roy B. Dalton, Jr.

United States District Court Judge



Appearances:

Counsel for Plaintiff:  Karen Gable
                          Ilyanis Rivera Miranda


Counsel for Defendant:  Matthews Bark


Court Reporter:         Diane C. Peede, RMR, CRR
                        United States Courthouse
                        401 West Central Blvd., #4600
                        Orlando, Florida  32801
                        (407) 615-0305

Proceedings recorded by mechanical stenography, transcript
produced by computer.

1                           **Index of Transcript**

2                                                        **Page**

3  **Closing arguments**

4  **By Ms. Gable**                                      **3, 29**
   **By Mr. Bark**                                         **18**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **P R O C E E D I N G S**

2   **\*\*\*\*\***

3               MS. GABLE:  Yes, Your Honor.  Thank you.

4               Your Honor, defense counsel.

5               Good morning, ladies and gentlemen of the jury.

6   Before I begin my closing remarks, I just want to thank you

7   for your service.  This has been a short trial, but it has

8   been an intense one.  The evidence has been disturbing.  It

9   has been horrific, and all of the parties in the case have

10  observed how you have been paying such close attention to the

11  testimony that was presented yesterday and to the exhibits

12  that were introduced and shown to you.

13              So, on behalf of the United States, I want to thank

14  you for your service and for paying such close attention to

15  all of the evidence in the case.

16              What has the government proven in this case?  The

17  defendant, Jon Adleta, he's a pedophile.  He is a man who was

18  sexually interested in children, a man who had a daddy-

19  daughter fantasy, a perverted daddy-daughter fantasy, a man

20  who realized that fantasy and turned that fantasy into a

21  reality in March of 2009 when his little girl, victim one in

22  the Indictment, was born.

23              The evidence has proven that the defendant, along

24  with his partner in crime, Sarah Adleta, agreed and caused

25  the transportation of his little girl in interstate commerce

1    with the intent to sexually abuse her.

2              Now, the defendant for his conduct has been charged

3    in two counts in this Indictment.  The first count charges

4    him with a conspiracy, conspiring with Sarah Adleta to

5    transport minor victim one in interstate commerce with intent

6    to sexually abuse her.  So what is charged in Count One is

7    the conspiracy, the agreement to do that.

8              What is charged in Count Two is what we call a

9    substantive offense.  It is the actual act of causing the

10   transportation of this little girl in interstate commerce

11   with the intent to engage in sexual activity.

12             The Court will instruct you as to the elements of

13   the offense, but I'm going to go through with you the

14   elements and explain to you how all of the evidence that you

15   heard yesterday proves beyond a reasonable doubt each and

16   every one of the elements of those crimes.  So we'll begin

17   with Count Two, which is the actual causing of the

18   transportation in interstate commerce.

19             As the Court will instruct you, the first element

20   of that offense is that this little girl was transported in

21   interstate commerce, and there is no doubt as to that.  You

22   heard the testimony of Sarah Adleta as well as Samantha

23   Bryant and saw the pictures, which are Exhibits 10 and 11, of

24   those children being in Oklahoma.

25             You heard from the bank custodian as well as the

1   custodian from American Airlines that in fact that child was

2   transported from Florida to Oklahoma and back in December of

3   2012, as charged in the Indictment.

4           In addition, the evidence is that the defendant

5   caused that transportation, and we know that because he paid

6   for the plane ticket.  That's what he did.  He caused her

7   transportation by agreeing with Sarah Adleta, telling Sarah

8   Adleta that he wanted those children to come out to Oklahoma,

9   telling Sarah Adleta the reason why, which was to molest the

10  little girl, and by paying for the plane ticket.  We know

11  that he did because you saw the bank records and the

12  defendant actually did purchase those tickets, and we saw

13  that -- Sarah Adleta testified to that.  That was

14  corroborated through the bank records.

15          The Judge is going to instruct you on the law of

16  agency and that is that, you know, in order for a defendant

17  to be convicted of a crime, he doesn't need to do every

18  single act involved in the offense.  He just has to

19  participate in the crime.  He needs to willfully join in the

20  crime.

21          So if he directs another to do something which he

22  could do himself, then he is liable for those acts.  So in

23  this case, the defendant directed Sarah Adleta, caused her to

24  bring the children out to Oklahoma.  She didn't have the

25  means to pay for that.  But for him, this would have never

1    occurred.  She wouldn't have been able to get out there.

2           The most important element of this crime, the one

3    that I told you yesterday, ultimately this case comes down to

4    that, is:  What was the defendant's intent?  Because that

5    really is the crux of this crime.

6           Was his intent to engage in sexual activity with

7    minor victim one when he caused her transportation in

8    December of 2012?  And the answer to that is yes.  The

9    evidence is overwhelming that that was his intent, to engage

10   in criminal sexual activity with her.

11          The Judge will instruct you that the government

12   need not prove that anyone actually engaged in sexual

13   activity in order for this crime to have occurred.  In other

14   words, you don't need to find that the sexual activity

15   actually occurred.  You just need to find that he intended

16   for that activity to occur.

17          So how do we know that he intended to engage this

18   little girl in sexual activity when he caused her

19   transportation on December 23 of 2012?  I'm going to give you

20   nine pieces of evidence that you saw yesterday that proves

21   beyond a reasonable doubt that that was his intent.

22          First, we know that the defendant is sexually

23   interested in children.  He is -- more importantly, he's

24   interested in that daddy-daughter sex, that incest fantasy.

25   And how do we know that?  Well, we know from Sarah Adleta's

1    testimony that that was something that he had established

2    very early on in their relationship.  Way back in 2008, 2009

3    he told her that he was sexually interested in kids.  He told

4    her, as she testified, that he had that fantasy, that sick,

5    perverted fantasy.

6          We know in his own words that he had that sexual

7    interest in children.  If you will recall Exhibit Number 5 --

8    that's at 211 -- in his own words, he said, "I'm still into

9    young and dad-daughter stuff.  So I don't know."  So we know

10   this defendant was sexually interested in children.

11         He showed Sarah Adleta pictures of child

12   pornography way back before he ever went to Afghanistan,

13   pictures that she described as naked girls, and in fact we

14   saw a couple of those pictures, ladies and gentlemen.

15   Exhibits 14 and 15, two of those pictures that Deb Healy, the

16   agent who is the forensic examiner, recovered from his

17   computer, if you will recall her testimony about those

18   pictures -- and you can look at those pictures and the data

19   is on there, but they were put onto his computer in 2008.  So

20   that corroborates to Sarah Adleta that he was interested in

21   children.  He had a daddy-daughter fantasy.

22         When the defendant and Sarah married in 2010, she

23   testified how they negotiated -- this is reason number two --

24   that he negotiated with her, that she agreed to his plan and

25   his rules for living as a family, rules that included the

1    sexual abuse of their children.  She told you about that, and

2    we know that to be true.  We know that that's what this

3    defendant was all about, that his plan, his way of living, as

4    disgusting as it is, was to sexually molest his children.

5    That was in his plan, in his cards; and we know her testimony

6    to be true because we saw it in his diary, in his own words.

7    That was Exhibit 1.

8            Remember when Agent Buchanan read those passages

9    and he in his own words talked about how Sarah was not okay

10   with this, that they had a lot to talk about, but that she

11   needed to know what he was about and needed to agree to what

12   he was about before marrying her.  All those passages were in

13   his diary about his desire to engage his little girl in hand

14   jobs and blow jobs and feel her up, and how he talked about

15   his little boy, who was not even born yet, and how he wanted

16   Sarah to do the same to his little boy, who was not even born

17   yet, because that's what this defendant is about.  He is

18   sexually interested in children; and for him, his plan, his

19   rules, his way of life with these two kids was to sexually

20   abuse them.  That's how he thought of them.

21           So that is another way that we know that that is

22   what his intent was when he saw his little girl and had her

23   travel across state lines, because from his diary, from all

24   that he said to Sarah before and during that time, you can

25   infer that any time he was going to see her, that's what he

1    was going to do, that that was his intent was to molest her.

2              Then we know, reason number three, that when he

3    came back from Afghanistan in 2011, during that year that he

4    lived with Sarah Adleta, he executed his plan.  He did what

5    he said he was going to do.

6              Sarah Adleta testified that he masturbated in front

7    of the children as if to teach his little girl how to become

8    used to seeing that type of activity, to groom her and to

9    prep her to be an object for him.

10             We know that he had her touch his penis again, as

11   if to teach this little child that this is what happens in a

12   family and this is what you should become used to.  So we

13   know that he did that during that time period, because Sarah

14   Adleta told you that, and that's corroborated by how he acted

15   after that.

16             Samantha Bryant told you that when he became

17   involved with her and her family, a new family for him, that

18   he did the same thing.  He masturbated in front of her little

19   girl.  He masturbated on top of her little girl.  So that's

20   how we know that his intent was to sexually molest his little

21   girl when he caused her transportation in December of 2012.

22             Then, after he and Sarah divorced and she moved

23   thousands of miles away form him with the kids, he still

24   continued to live along the lines that he said that he was

25   going to live with these children.  He still continued to

1   sexually abuse them.  He still continued to masturbate in

2   front of his child, only it was over Skype.

3          You can believe Sarah Adleta about that because

4   Samantha Bryant testified about the same thing; that, once

5   again, when he became involved with her child during that

6   same year, in 2012, he Skyped and asked to see Samantha

7   Bryant's little girl, just as he had done with Sarah and her

8   little girl, and asked to see that child naked and then

9   masturbated over Skype in front of that child.  The same

10  pattern.  The same person.  The same -- it is the exact same

11  conduct, because that is his intent.  That is what he plans

12  to do and that's what he does.

13         Reason number eight.  Even before K. traveled, even

14  as he was masturbating on Skype, he also was receiving

15  pictures, pictures of Sarah molesting their little boy at the

16  exact same time, in November of 2012, and we know that

17  because Agent Healy recovered that picture and that picture

18  was placed on his computer on November 10th of 2012.

19         We know that it was his intent because Sarah Adleta

20  testified that the defendant told her, as they were making

21  preparation for their little girl to fly out there, that his

22  plan, what he wanted to do specifically was to, quote, "give

23  her a facial and to get a blow job," and he said he was going

24  to videotape it.

25         We know his intent.  He told Sarah Adleta.  He said

1    it and Sarah Adleta agreed.  She agreed with him.  She was

2    his partner in crime and she told you she agreed, that he

3    could do these things, and that she would bring her child to

4    him, serve her up, serve her up to him to feed his sexual

5    appetite for her.

6          Then you heard Sarah Adleta's account of what

7    happened when they were out there and Sarah Adleta told you

8    that he masturbated on the child when she was on the bed and

9    that she became upset and she cried, and that he told Sarah

10   that he had placed his penis in that child's mouth when they

11   were in the shower, and we know that happened because we have

12   his words.  He admitted to it.

13         When they returned in January of 2013, they talked

14   about it through their text communications and their Skype

15   communications.  If you look at Exhibit 3 -- this is, I

16   believe, 209 -- look what he says to Sarah.  Those are his

17   words, his admission, that he did what he said he was going

18   to do, that he carried out his intent.

19         Again, Exhibit 4, during a text communication that

20   they had on February 12th of 2013, when he asks Sarah, "You

21   having someone c-u-m on her?"  And Sarah answers, "No.  I was

22   referring to her with you the last time.  Remember, she

23   freaked out," just as she had testified on the stand.

24         What does the defendant say?  "Yeah, she kind of

25   did.  Maybe you should get someone to c-u-m on her."

 1          We know his intent was to sexually molest his

 2   little girl when she traveled to Oklahoma because that's what

 3   he told Sarah and that's what he did, and you know that it

 4   happened.

 5          How else do we know it was his intent?  Because he

 6   did the same thing to Samantha Bryant's little girl just

 7   weeks, just weeks before his little girl traveled to

 8   Oklahoma.

 9          Samantha Bryant told you how he came to her home in

10   Texas and how he molested her little girl, and, unbelievably,

11   she let it happen.

12          Then he used -- she took -- she took -- used a

13   camera and took pictures of it, and we know that to be true

14   because we found one of those pictures on his computer, a

15   picture that we know was taken November 17th, because Agent

16   Healy was able to recover the XF data from that picture.

17   Remember, that was the picture that Samantha took with the

18   defendant's Casio camera, and that picture, too, was on his

19   computer hard drive.

20          We know that it was his intent because he would --

21   he showed Sarah Adleta stories, stories about daddies and

22   daughters having sex; and you can believe Sarah Adleta about

23   that, too, because Samantha Bryant testified to the same

24   thing.  In fact, she told you that she wrote stories for him.

25   And if we look at Exhibit Number 18, at 198, this is one of

1    the stories that she wrote, a story that she sent to him

2    November 10, 2012, just weeks, a story that was a fantasy

3    story about him and her having sex with their two little

4    girls.  That's how we know that that was his intent.  It's

5    because that's what he said, his actions, his words.  That's

6    how you know a person's intent, what they say and what they

7    do.  And what this defendant said and what this defendant did

8    was to molest his little girl.

9         The final element of that offense, causing the

10   transportation of a child, is that if the sexual activity

11   occurred, he could have been charged with a criminal offense

12   under laws of Oklahoma, and the judge will instruct you what

13   that is; but in this case, he masturbated on her.  That was

14   his intent.  His intent was to get oral sex, which he did;

15   and those all are crimes under Oklahoma law, of course.

16        How do we know that he actually did engage this

17   child in oral sex in the shower?  Because Samantha Bryant

18   told you and Sarah Adleta told you.  He told them as if he

19   was proud that he had done that.  He told Sarah Adleta that

20   he had taken her little -- their little girl into the shower

21   and put his penis in her mouth, and he said the same thing to

22   Samantha Bryant and he told Samantha Bryant that he

23   ejaculated.

24        The first count of the Indictment is the

25   conspiracy, a conspiracy to transport the child.  So it's an

1    agreement and all it is is an agreement that these two

2    individuals had to transport this child in interstate

3    commerce.  Again, the government does not need to prove that

4    the transportation actually occurred, just that they actually

5    had an agreement; but in this case, the evidence of their

6    agreement is plain.

7              First, Sarah Adleta testified that they had an

8    agreement; that she agreed with him that when they

9    transported the child in interstate commerce, that he could

10   do these things.  But from the very beginning of their

11   relationship, ladies and gentlemen, this is how they acted.

12   From 2010, when she had those babies and he said to her the

13   way that he wanted to live and the sexual abuse that he

14   wanted to inflict upon them, she agreed to that.  She told

15   you that was a condition of their marriage which she agreed

16   to and his diary proves that out.

17             Those pages that Ian Buchanan read to you

18   yesterday, all of those pages show how he was persuading and

19   negotiating and making sure that she was on board and agreed

20   to what he wanted before he married her, and she did and they

21   got married; and the entire way that these two parented these

22   children was to sexually abuse them.  From the very

23   beginning, that's how they raised them.

24             So.  When Sarah Adleta transported that child, she

25   agreed with him that he could sexually abuse these kids, and

that agreement was an ongoing agreement.  Look at the way they parented these kids.  They consulted each other about everything.

     If you will recall, she asked the defendant in those exhibits, 2, 3, 4, 5, 6 -- those are the chats and texts they had -- she consulted with him about using a dildo on his child.  After they returned from Oklahoma, after he had already sexually abused this little girl, returned her back to Florida, back across state lines and while in Florida, the two of them talked about continued plans for transporting this child in interstate commerce and continuing plans to sexually abuse her.

     So, if you recall, when they first got back from Oklahoma, they have conversation immediately.  Jon Adleta, who has not seen this -- who only saw this child in Oklahoma one time, one time, because, remember, the two of them had only been divorced for a year and Sarah lived here in Florida and Jon lived in Oklahoma and Texas, so as soon as he had Sarah or had his little girl and had engaged in those sex acts, he wanted more.

     So, when they got back, immediately he started negotiating with Sarah about plans to have both of those children at his home for longer periods of time.  Recall how they were talking about having the children spend two weeks with him, three weeks out of five weeks, and they were

talking about and they were planning that; and at the same time with all those texts and communications, they're planning the continued sexual abuse of little -- of their little girl.

So recall when she's telling him that she wants to get a dildo for this child, a three-year-old, and what he thought about that.  He was fine.

Recall when she talked about using sounding rods on a three-year-old and she talked about giving this three-year-old an orgasm, a three-year-old, and his reaction was, "Oh, sounds like it hurts."

Recall how he's talking about ejaculating on her and how she became scared by that, and his acknowledgment and his solution was to serve her up to other men so that they could do the same thing to him -- to her.  That was his solution, because these two had this agreement that this is how they would raise these children, his little girl in particular, and that it was their understanding that any time this child traveled across state lines, any time either one of them would see her, it would be with the intent that they engage in sexual activity.  That's how they operated.  Those are their words.

Finally, finally at the very end of the communication, in March of 2013, recall that Sarah was arrested.  The defendant was arrested in March of 2013.  So

1  that last communication that we have, that the government was

2  able to seize from Sarah Adleta's media devices, was a

3  conversation where Sarah Adleta tells him, tells the

4  defendant, that she is going to take their child to that

5  monster, Aaron Dixon, for that person to sexually abuse her,

6  and the defendant's reaction:  "Well, you gotta record it,"

7  because that was the plan.  That was the understanding that

8  these two people had, the defendant and Sarah Adleta.  Their

9  understanding was that this little girl would be abused, and

10 any time she traveled across state lines, that would occur.

11          When she returned back to Florida, there were many

12 sex acts perpetrated on that child.  Sarah Adleta told you

13 about those sex acts:  The defendant Skyping with her,

14 masturbating through the Skype while the child was present,

15 all the sex acts that Sarah Adleta inflicted upon this child,

16 because that was their understanding, that any time she

17 traveled, it would be with the intent to engage in sexual

18 activity.  That's what would happen.  That's how they

19 operated.

20          196.

21          The defendant, you know, he had a daddy-daughter

22 fantasy and it became his reality.  That was his reality,

23 ladies and gentlemen.  Unfortunately, tragically, it was

24 their reality, too.

25          No one can undo the cruelty and abuse that the

1  defendant has inflicted upon his little girl; but what you

2  can do, what the evidence calls for in this case is for you

3  to consider the evidence, look at the evidence, and then come

4  out and say, "Mr. Adleta, we find you guilty of the crimes in

5  this Indictment."  Thank you.

6           THE COURT:  Thank you, Ms. Gable.

7           Mr. Bark.

8           MR. BARK:  Thank you, Your Honor.

9           Good morning, ladies and gentlemen.  I know it's

10  hard for you to sit here and probably listen to what I even

11  have to say at this moment, and I thank you for giving me the

12  courtesy of doing so.

13           When we began the trial, when we started with voir

14  dire and jury selection, we made great efforts to see if you

15  were the proper jurors to sit here, to make sure that you

16  could look at very disturbing evidence and still make a

17  determination of whether Mr. Adleta is guilty or not guilty

18  of the charges in the Superseding Indictment.  Judge Dalton

19  went over that with you at great length.  It took a full day.

20  So I ask you to fulfill that commitment and to do that.

21           The government has presented their argument and

22  there are some things I'm going to ask you to look for in

23  making your determination.  And I agree with the government.

24  The thing you have to do is determine whether on this date at

25  this time, whether Mr. Adleta's intent in transporting his

 1    children during the Christmas holiday was for the purpose of

 2    sexually -- performing sexual activity with his daughter.

 3              Now, it is certainly reasonable to believe that

 4    there were other reasons for him to want his daughter to come

 5    to Oklahoma during Christmas.  So we start with that.

 6              Two, the government relies tremendously upon Sarah

 7    Adleta's testimony as to the event that they allege occurred

 8    in Oklahoma.  Now, why should we have issue with Sarah

 9    Adleta's testimony?

10              We should have tremendous issues with Ms. Adleta's

11    testimony.  One, let's begin with the fact that she met Aaron

12    Dixon in 2005.  She had no idea at this time who Jonathan

13    Adleta was and she was already engaged in a relationship with

14    a man known as Aaron Dixon.

15              She does not meet Mr. Adleta until much later.  She

16    has children with him and she makes an exchange.  She says

17    she makes a deal with Mr. Adleta that to marry him, they have

18    to live a certain lifestyle.  So she's willing to do that

19    because she loves him.  So she's already expressed to you the

20    type of person that she is.

21              Then she comes into this courtroom and tells you,

22    "I entered into a plea deal and that my resolution is going

23    to be better" --

24              MS. GABLE:  Objection.

25              THE COURT:  Sustained.

1        MR. BARK:  That in order for her to get the benefit

2   of the plea deal, she had to cooperate with the government.

3   Everything Sarah Adleta does is for Sarah Adleta.

4        Now, Mr. Adleta also confronted her about the

5   children, about custody of the children, who should have the

6   children, and whether anything should be done about the way

7   the children were being raised.

8        If you recall, she had to think for several minutes

9   about what I was talking to her about; and I would suggest to

10  you that the only things that she could testify to were

11  things that she thought would benefit her, based on her

12  demeanor and reaction to those questions.

13       Now, some of the testimony that the government has

14  just discussed with you is that the Adletas' daughter would

15  touch Mr. Adleta's penis or -- excuse me -- the way that was

16  presented to you by the government was that Mr. Adleta would

17  have the daughter touch his penis.

18       Now, that is not the way I recall Ms. Adleta's

19  testimony.  In fact, I recall her saying that their daughter

20  would just walk up and touch it.  Now, that is going to be up

21  to you to rely on your own recollection as to the way you

22  heard that testimony, but that it is different than what the

23  government has said to you.

24       Now, the reason I bring that up is not because we

25  need to test our memories or not.  It's because we have seen

a tremendous amount of disturbing photographs, images, communication, but how do we interpret it all?

We have to interpret it as the date of the intent of the transportation.  Now, the reason I say that is there is no communication in writing, on Skype or in any text messages prior to the transportation that this was the intent of the transportation.

If you go back and look at the exhibits, it is after the transportation that there's a discussion about ejaculation, that there's a discussion about masturbation, that there's a discussion about blow jobs between Sarah Adleta and Jonathan Adleta.  None of that occurs prior to the transportation.

Now, you may be saying to yourself, "Why do we care?  The things we have seen are tremendously disturbing."  But we live in a country of laws.  We live in a country where you, the jurors, your responsibility is not to find the person guilty of anything that they could possibly be found guilty of, but what the charges are in the Indictment and what they are being alleged to have done.

That burden is on the government, and I ask you not to carry that burden for them, but that for you to make your own determination as to whether the defendant is guilty of the conduct alleged in the Indictment.

So then you may ask, how do you explain the

1    journal?

2            When we discussed in opening statement the

3    difference between fantasy and reality, and you have been

4    presented a journal highlighted as to the particular points

5    that the government would like you just to rely on.

6            You will be given the journal to take back with you

7    and to review, and it is quite extensive, of Mr. Adleta's

8    time in Afghanistan; and as you review the entire journal you

9    will see a man who is conflicted between a thought, between a

10   fantasy and what to do about that.  You will see a man who's

11   tremendously conflicted.

12           I can't stand before you and tell you that this is

13   a perfect man that we should honor, and I don't say that; but

14   I ask you to look deeply into that journal and to find out if

15   that was his intent at the time of transportation.  Was that

16   his intent at the time he bought those plane tickets or was

17   it just to see his daughter during Christmas?

18           One of the other things I want to point out is the

19   Skype communication with Samantha Bryant and Sarah Adleta.

20   Now, one of the things that we've heard is that Sarah Adleta

21   said that Mr. Adleta would masturbate on Skype, on the video

22   conference, and that the children would be there.

23           We do not have a clear indication of what the

24   children being there means.  Were they just in the house or

25   in the room?  Were they watching something on TV?  Were they

1   playing a video game on an iPad or anything like that?

2           You're going to be given an instruction on

3   activities in the presence of, but you're not going to be

4   given a definition of "in the presence of."  I would submit

5   to you that "in the presence of" does not just mean

6   physically present, but also mentally present and aware, and

7   that relates to this circumstance with the Skype video

8   account, because I'm not sure what Sarah Adleta meant by

9   "present."

10          In fact, this may be difficult to understand, but

11  based on Sarah Adleta's demeanor and consistent portrayal of

12  herself in this proceeding, that she defines "masturbating"

13  the same way everyone else does, and she has not provided to

14  you what that definition means.

15          Now, perhaps she knows exactly what we're talking

16  about, but does she say that it's even on the video, that we

17  could see it going on in the video?

18          She says that he would masturbate in front of the

19  children, I believe, like, under a blanket or something of

20  that sort, and then when asked, she said, "Well, you know,

21  touching himself."  Perhaps that's all she means by

22  "masturbating."  Perhaps it's, for lack of a better

23  explanation, an Al Bundy-type of conduct.  I don't know, but

24  neither do you.

25          Now, you're being asked to do something that's

1   incredibly difficult, which is to look at certain evidence of

2   prior conduct and to incorporate that in your decision

3   making, and I ask you just to exercise great caution in the

4   way you do that.

5           Now, one of the items of proof the government says

6   that you should rely on is a photograph taken -- that they

7   say was taken on November 17th on the camera, and I just want

8   to remind you that the government's own expert said that we

9   can't be sure of the exact date.  The dates can be

10  manipulated on the camera, on the computer.

11          Now, they said when they got the camera, it was set

12  fine, to the right date, but that doesn't mean that it was

13  set fine throughout the duration of the time period that

14  we're discussing throughout this trial.

15          Now, I found it also very interesting that the

16  government didn't mention Aaron Dixon until the very end of

17  their argument, and the reason I find that very interesting

18  is because the relationship between Aaron Dixon and Sarah

19  Adleta is probably one of the most important things for us to

20  look at here today.

21          Now, you heard some testimony about Mr. Adleta's

22  concern with the children.  You heard some testimony about

23  that he wanted to see his children over certain periods of

24  time after they're divorced, a custody dispute; and the

25  government puts so much weight into the fact that he says,

1    "If you take her there, make sure you record it," because

2    it's for his purposes.

3            Well, it may be for his purposes, his purpose of

4    getting custody of his children because of the conduct of his

5    ex-wife with a person she met --

6            MS. GABLE:  Your Honor, objection.

7            THE COURT:  Overruled.

8            MR. BARK:  -- because of the conduct of someone she

9    met before she ever even knew Jonathan Adleta.

10           Now, you're going to be instructed on what a

11   reasonable doubt is.  You're going to be instructed on the

12   burden of proof and the presumption of innocence, and there

13   are alternative reasons for the conduct of a very troubled

14   man, and that the events that occur in 2013, after the

15   transportation occurred, cannot define the intent of Mr.

16   Adleta at that time, especially since there's a custody

17   dispute going on throughout this proceeding.

18           Now, the government then says, "Okay.  Fine.

19   Perhaps we can't prove that.  We also charge him with a

20   conspiracy and an agreement to conduct these activities."

21           We don't know if this is an agreement.  In fact,

22   there never, ever has been a time where they agreed that he

23   would see the children two weeks out of the month, three

24   weeks out of the month.  There is an agreement that he would

25   see the children at some point, but she said, "I haven't even

1   received the child support yet; and basically until I do

2   that, we'll then resolve when you can see them."

3           There's no agreement here for continuing, ongoing

4   acts whatsoever.   There is a dispute here.   There is a sick

5   woman here who is taking her child to another man.

6           Now, what's interesting about that is that the only

7   person that has testified to you today that Jonathan Adleta

8   masturbated in front of his daughter, that he ejaculated on

9   his daughter is the same woman who he was in that custody

10  dispute with.   This is the only person.

11          Now, I'm concerned that you may look to the fact

12  that Samantha Bryant said that they had sex and Mr. Adleta's

13  daughter was in the bed with them, and that perhaps you rely

14  on that to coming to a finding of guilt; but, once again, I

15  stress to you that there is no definition in these jury

16  instructions of what "in the presence means."   And "in the

17  presence" is not just physical presence, but that the child,

18  I would submit, must be mentally aware of what was going on

19  as well.   I'd ask you to consider that in your finding.

20          I think your job is incredibly difficult here today

21  because the things you have seen are horrific.   They're

22  disgusting.   There's no way to hide that, but your job is not

23  to find -- there's no line that says that, "We, the jury,

24  find the defendant horrific."   It says, "We, the jury, find

25  the defendant" either "guilty" or "not guilty" of the charges

1  in the Indictment, and I submit to you that the government

2  has failed to do that here today.

3         In Exhibit 3, line 2000 -- no -- line 209, the

4  government referred to that in their argument, and the quote

5  is, "You like seeing me come on her?"  And they rely on that

6  as corroboration, as support for Sarah Adleta's testimony

7  that Mr. Adleta did this act.

8         Once again, this is an interesting discussion, a

9  fantasy, a conflicted mind of stories of fantasy.  I mean, we

10 see the stories.  We see the fantasy.  We have a witness,

11 Samantha Bryant, who freely admitted to you how much he

12 enjoyed the fantasy.  And we don't know the difference

13 between fantasy and reality throughout this proceeding, and

14 that is scary, but that is also reasonable doubt, because we

15 don't know what is real and what is not.

16        We don't know during this custody dispute in 2013,

17 after the children were in Oklahoma, that that statement, is

18 that a setup so that Mr. Adleta can preserve evidence against

19 Sarah Adleta?

20        So we have to weigh all of this.  We have to look

21 at all of this.  Is this -- it could be dubious on his behalf

22 to set up his ex-wife so he could have custody of his

23 children.  We just don't know.

24        Mr. Adleta is not the one who talked about sounding

25 rods.  Mr. Adleta is not the man who took his child to see, I

1    believe -- I'm not sure which adjective the government

2    used -- to see the monster, Aaron Dixon.

3           There's another thing I want to point out.  Sarah

4    Adleta has pled to -- well, no.  Let me make sure I say this

5    correctly.  She has admitted to performing oral sex on her

6    daughter and she has told you with her own mouth that

7    Jonathan Adleta never witnessed that, that he never observed

8    that, that this was done for Aaron Dixon.

9           Misery loves company.  It doesn't always deserve

10   it.

11          We discussed how difficult the job is that you have

12   before you.  We discussed how disgusting the evidence is and

13   how difficult it is to disseminate between it, but I submit

14   to you that Mr. Adleta is not guilty of the charges that are

15   in the Superseding Indictment that is before you.  Not only

16   do I submit that, but I submit to you, as the Judge told you

17   when we began this, about the jury process and the

18   Constitution, that for over 260 years we have valued a jury

19   and the reason we have a jury is for a situation just like

20   this.  We are bogged down.  We are busy and we are trying --

21   everyone is trying their best to present to you the things

22   that should be presented to you and the way they should be;

23   but in this particular case, these particular charges are the

24   wrong charges.

25          Mr. Adleta is not guilty of the offenses in the

1  Superseding Indictment.  He may well be guilty of other

2  things, but you're not here to decide that today.  You're

3  here to decide whether we are making strides towards a more

4  perfect union and how much we value that, and your

5  determination, your verdict will show that.  Thank you.

6              THE COURT:  Thank you, Mr. Bark.

7              Ms. Gable.

8              MS. GABLE:  Thank you, Your Honor.

9              None of the facts you just heard are in evidence

10  before this jury.

11             How do we know what the defendant's intent was in

12  this case?  It's all of the evidence in the case.  Every

13  single piece of evidence, from his diary, his possession of

14  child pornography, his molestation of children, his

15  molestation of his little girl, his admissions that he did

16  that, that's how we know what his intent is.

17             Defense counsel told you that it had to be the

18  purpose, that the reason why she was transported was for that

19  reason, but that's not what the law is.  That's not what the

20  statute says.  It does not say that he transported her for

21  the purpose.  He transported her with intent to engage her in

22  sexual activity.

23             Sarah's testimony, everything that she said was

24  corroborated by the evidence in this case.  She talked to

25  you -- I mean, everything that she said was corroborated.

1   She told you about child pornography and stories on the

2   Internet, and Samantha Bryant corroborated the stories.  You

3   saw a story that was written about his father-daughter

4   fantasy.  The child pornography was found on his computer.

5   He molested Samantha Bryant's little girl.  All of that shows

6   what his intent was, and everything that Sarah testified to

7   was corroborated by all of the evidence in the case.

8           Regarding the touching of the penis, recall the

9   testimony of Sarah Adleta.  His penis was erect when the

10  little girl touched it and he was naked.

11          The journal that's in evidence shows what his

12  intent was.  His intent was to sexually assault his children.

13          With the Skype, whether the children were present,

14  knew what was going on or not, his intent was to masturbate

15  in front of them, to perform a sex act in front of them.  And

16  why was he doing that?  Because he was grooming them,

17  grooming them to become familiar with that, grooming them to

18  become accepting of that conduct.

19          The most disturbing thing that was said to you

20  during defense counsel's closing was to suggest to you that

21  this defendant allowed Sarah Adleta to take her child to be

22  sexually molested and that he wanted to record it for a

23  custody dispute.

24          There's no evidence at all in this case that there

25  was a custody dispute; but for him to suggest that this

 1   father would allow the child to be sexually molested so that

 2   he could get a recording for a custody dispute, no.  Ladies

 3   and gentlemen, he wanted a recording of that, if it occurred,

 4   to satisfy his own lustful desires.

 5            This case is about a defendant who was sexually

 6   interested in his children.  The defendant's intent was that

 7   that child be sexually abused when she was transported with

 8   interstate commerce.  We ask you to review all of the

 9   evidence and to please return guilty verdicts.  Thank you.

10   *****

11            (Excerpt concluded.)

12                     - - - - - - - -

13                 Reporter's Certification

14   I certify that the foregoing is a correct transcript from the

15   record of proceedings in the above-entitled matter.

16                         s/Diane Peede, RMR, CRR
                           Official Court Reporter
17                         United States District Court
     Date:  December 18, 2013   Middle District of Florida

18

19

20

21

22

23

24

25